**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

---

ALISON BEAUCHINE,

                                   Plaintiff,                    5:21-cv-00845 (BKS/TWD)

v.

CITY OF SYRACUSE, NEW YORK; POLICE CHIEF
KENTON BUCKNER; DEPUTY CHIEF RICHARD
SHOFF; DEPUTY CHIEF DEREK McGORK; DEPUTY
CHIEF JOSEPH CECILE; DEPUTY CHIEF RICHARD
TRUDELL; MICHCA BALLARD-FORTIN; and JOHN
DOE(S) and/or JANE DOE(S), in their individual and
official capacities as officials, officers, agents, employees,
and/or representatives of the CITY OF SYRACUSE
and/or the SYRACUSE POLICE DEPARTMENT,

                                   Defendants.

---

**Appearances:**

*For Plaintiff:*
A.J. Bosman
Robert Strum
Bosman Law, L.L.C.
3000 McConnellsville Road
Blossvale, New York 13308

*For Defendants City of Syracuse, New York, Police Chief Kenton Buckner, Deputy Chief Richard Shoff, Deputy Chief Derek McGork, Deputy Chief Joseph Cecile, Deputy Chief Richard Trudell, and Michca Ballard-Fortin:*
Nicholas P. Jacobson
Daniel J. Pautz
Bond Schoeneck & King, PLLC
One Lincoln Center
Syracuse, New York 13202

**Hon. Brenda K. Sannes, United States District Judge:**

**MEMORANDUM-DECISION AND ORDER**

## I.    INTRODUCTION

Plaintiff Alison Beauchine, a Police Officer with the Syracuse Police Department

("SPD"), brings this employment discrimination action against her employer, Defendant City of

Syracuse (the "City"), as well as Defendants SPD Police Chief Kenton Buckner, Deputy Chief

Richard Shoff, Deputy Chief Derek McGork, Deputy Chief Joseph Cecile, Deputy Chief Richard

Trudell, and Michca Ballard-Fortin. (*See generally* Dkt. No. 2).[1] Plaintiff alleges: disability

discrimination and retaliation in violation of the Americans with Disabilities Act (the "ADA"),

42 U.S.C. § 12101 et seq., the Rehabilitation Act of 1973 (the "RHA"), 29 U.S.C. § 701 et seq.,

and the New York Human Rights Law (the "NYSHRL Law"), N.Y. Executive Law § 290 et

seq.; gender and race discrimination, as well as retaliation, in violation of the Fourteenth

Amendment, 42 U.S.C. §§ 1981, 1983, and the NYSHRL; retaliation in violation of the First

Amendment, 42 U.S.C. § 1983; tortious interference; prima facie tort; intentional and/or reckless

infliction of emotional distress; and negligence. (Dkt. No. 2). Defendants move to dismiss the

Complaint, in part, under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim.

(Dkt. No. 7). Plaintiff opposes Defendants' motion and cross-moves to file an amended

complaint under Rule 15. (Dkt. No. 12). Defendant opposes Plaintiff's cross-motion to amend.

(Dkt. No. 13). For the reasons that follow the parties' motions are granted in part and denied in

part.

## II.    FACTS[2]

Plaintiff, a disabled white female, is a police officer for the SPD. (Dkt. No. 12-2, ¶¶ 4,

21). Plaintiff is a civil service employee and union member. (*Id.* ¶ 22). Plaintiff's 2020

performance evaluation states that Plaintiff "possess[es] the work ethic, qualities, and

characteristics to be a good supervisor." (*Id.*).

---

[1] Plaintiff also names John and Jane Doe Defendants. Those Defendants have not yet been identified and are not represented in connection with the present motion. Accordingly, unless otherwise noted, any reference to Defendants excludes the John and Jane Doe Defendants.

[2] The facts are drawn from the Proposed Amended Complaint. The Court assumes the truth of, and draws reasonable inferences from, the well-pleaded factual allegations. *Faber v. Metro. Life Ins. Co.*, 648 F.3d 98, 104 (2d Cir. 2011).

### A.      Plaintiff's Application for § 207-c Disability Benefits

At some point prior to February 2016, Plaintiff was "injured in the performance of her police officer duties"—"[s]he suffers from Post Traumatic Stress Disorder (PTSD) related to several on-duty incidents." (*Id*. ¶ 23).[3] In February 2016, following the diagnosis of PTSD, Plaintiff's "doctor took her out of work." (*Id.* ¶¶ 23–24). Plaintiff applied for benefits under New York General Municipal Law § 207-c. (*Id.* ¶ 24).[4] Plaintiff received no decision on her application for benefits. (*Id.*).

On March 23, 2016, "Plaintiff requested to return to work performing light duty tasks." (*Id.* ¶ 24). Defendants responded that "she would not be allowed light duty work because her injury was not on-duty," and "notified her that it would not allow her to return to work until she was seen by its doctor and deemed fit for duty." (*Id.* ¶ 27). "During Plaintiff's treatment for [PTSD], she was forced to exhaust her time off and enter a 'sick bank.'" (*Id.* ¶ 24).

In August 2016, Plaintiff was examined by Defendants' doctor, Dr. Cross, who "told Plaintiff that the injury was 'of course' an on-duty injury." (*Id.* ¶ 27). Defendants "subsequently claimed that Dr. Cross was not qualified to make such a determination." (*Id.*).

Plaintiff returned to work on September 1, 2016. (*Id.* ¶ 28). Plaintiff notified her supervisor that she was pregnant. (*Id.*). Because of her pregnancy, Plaintiff was given desk work. (*Id.*). Plaintiff's supervisor "told Plaintiff that [then-]Chief Thompson ordered her to write a 10.1 disciplinary memorandum about why she was pregnant and on desk work." (*Id.*). However, under SPD's "standard policy and practice," pregnant officers are allowed "non-patrol work" without completing a memorandum. (*Id.*).

---

[3] In August 2015, for example, Plaintiff responded to a call reporting that "a babysitter threw a two-year old child down the stairs," and "witnessed the extent of the child's severe injuries." (Dkt. No. 12- 2, ¶ 26).

[4] New York General Municipal Law § 207-c provides that any "police officer . . . injured in the performance of his or her duties . . . shall be paid by the municipality by which he or she is employed the full amount of his or her regular salary or wages until his or her disability arising therefrom has ceased, and, in addition such municipality shall be liable for all medical treatment and hospital care necessitated by reason of such injury or illness."

In December 2016, Plaintiff, at Defendants' direction, was examined by a second doctor—Dr. Fayer— in New York City. (*Id.* ¶ 29). Dr. Fayer told Plaintiff that "it was not his job to determine if her PTSD was caused by on-duty experiences." (*Id.*). During the examination, Dr. Fayer "acted in a peculiar manner; he took a long phone call and, at one point stopped to feed birds." (*Id.*). In his report, Dr. Fayer "asserted that Plaintiff did not have PTSD and that, if she did, it was caused by childhood trauma—not her experiences as a police officer." (*Id.* ¶ 29). This report "contradicted the determinations of Plaintiff's own doctors and" Defendants' first doctor, Dr. Cross. (*Id.*).

In early 2017, Plaintiff discussed the inaccuracies in Dr. Fayer's report with "then-Chief Fowler and Deputy Chief Cecile." (*Id.*). Plaintiff had still not received a determination on her application for § 207-c benefits. (*Id.*).

In July 2017, Plaintiff returned to full patrol duties, which included training "a new recruit as a field officer." (*Id.* ¶ 30). In November 2017, Plaintiff "experienced another traumatic event": a tow truck intentionally hit Plaintiff's police cruiser "during a pursuit that escalated into a shots-fired incident." (*Id.*). This event "contributed to Plaintiff's depression." (*Id.*). In early 2018, Plaintiff accepted a non-patrol position in the Records Division, and, after "several months of training," took over the position in June 2018. (*Id.*).

### B.  August and October 2020 Sergeant Promotion Decisions

In 2019, Plaintiff took the civil service test to become a sergeant. (*Id.* ¶ 31). "[T]o familiarize herself with recent changes to the law and better prepare herself to perform the duties of Sergeant, Plaintiff requested to be scheduled for a day on patrol." (*Id.*). Defendant Deputy Chief Shoff verbally agreed to Plaintiff's request and told Plaintiff that if she wanted to be promoted, "she would need to transfer back to patrol full-time." (*Id.*). Deputy Chief Shoff "later emailed a response denying the shift assignment." (*Id.*). At some point prior to these interactions, Deputy Chief Shoff "commented" that Plaintiff "'can't go back to the road,' despite having been

deemed fit to do so in 2016 and working patrol on multiple occasions since that determination." (*Id.*). In "early 2020," Deputy Chief Shoff stated that a female police academy recruit was "'too girly' to succeed as a police officer." (*Id.* ¶ 34).

"In June 2020, Plaintiff was interviewed by Defendants Buckner, Shoff, McGork, Cecile, and Trudell for the sergeant's position." (*Id.* ¶ 32). "Defendants Shoff, McGork, Cecile, and Trudell participated in the promotion selection process by interviewing candidates with Defendant Buckner and providing input to him with respect to who should and shouldn't be promoted." (*Id.* ¶ 35). In August 2020, Defendants promoted a male officer to sergeant. (*Id.* ¶ 33). The male officer's civil service test score was lower than Plaintiff's, "unlike Plaintiff, [the male officer] had no Field Officer Training experience," and [the male officer] "had been removed from road patrol in the past in response to multiple reports of unsafe and unlawful behavior, including a 2016 incident where he fired at a vehicle without proper justification." (*Id.*). In addition, Plaintiff's "performance has been above average as demonstrated by her performance evaluations and [Plaintiff] has no disciplinary history." (*Id.* ¶ 32).

In October 2020, five male officers, all of whom had "lower test scores and less seniority and experience" than Plaintiff "were promoted instead of Plaintiff." (*Id.* ¶ 33). When Plaintiff asked Deputy Chief Shoff "for an explanation, he told her it was because of her conversation with the Chief." (*Id.*).[5] This conversation occurred in 2018 when Plaintiff went to Chief Buckner with paperwork for his signature. (*Id.*). When Chief Buckner "questioned . . . why a police officer was doing administrative work," Plaintiff responded that she had taken "the position in the Records Division due to her PTSD and depression." (*Id.*). Plaintiff also told Chief Buckner "that she had still not received a determination on her application for § 207-c benefits." (*Id.*).

---

[5] After "one of the promotion denials"—Plaintiff does not indicate which one—Deputy Chief Shoff "told Plaintiff that she needed a 'time-line,'" which Plaintiff understood to mean Plaintiff "had not worked enough patrol shifts to be promoted." (Dkt. No. 12-2, ¶ 34).

On October 15, 2020, Plaintiff emailed Chief Buckner and Deputy Chiefs Shoff, McGork, Cecile, and Trudell "to ask why she was repeatedly passed over for promotions in favor of less qualified candidates and complain that she felt it was related to her PTSD." (*Id.* ¶ 35; Dkt. No. 7-2, at 79–80). Plaintiff also "formally request[ed] all of [her] sick time, furlough day and personal days" be returned to her, noting that she was "forced to use all of those, while never being provided with any written outcome as to whether or not [the PTSD] diagnosis was 'on duty' or not," and that several doctors, including one of Defendants' own doctors, had deemed PTSD as "on duty." (Dkt. No. 7-2, at 79).

### C.   Request for Determination on § 207-c Disability Benefits Application

On November 25, 2020, and again on December 2, Plaintiff's union representative, Jeffrey Piedmonte, "emailed Chief Buckner and others . . . to inquire about the determination of [Plaintiff's] § 207-c application." (Dkt. No. 12-2, ¶ 36). Chief Buckner responded "that he would follow up after meeting with attorneys." (*Id.*). Plaintiff had been "repeatedly advised by Sergeant Susan Izzo, the then Director of Human Resources, that no decision had yet been made on her 207-c application." (*Id.* ¶ 38)

On December 7, 2020, Chief Buckner emailed Piedmonte that "review of files has revealed that" Plaintiff's February 2016 application for § 207-c benefits "was denied, but that [he] was unable to provide a copy of the denial letter." (*Id.* ¶ 37). On December 9, 2020, Plaintiff notified Chief Buckner "that she was appealing the decision that she is not entitled to the benefits," (*id.* ¶ 37), and in an email that same day to Chief Buckner and Deputy Chiefs Cecile and Shoff, among others, Plaintiff stated that she was never provided "with any documentation denying [her] 207c claim," and that December 8 was the first time she was "notified that a 'decision' was made." (Dkt. No. 7-2, at 81). Plaintiff requested documents as well as other information about the denial of her claim and asserted that the procedure specified in § 207-c had not been followed and asked why she had not been notified sooner of the denial. (*Id.*). Plaintiff

stated: "This entire process has been extremely frustrating, absolutely unfair and discriminatory towards me. This was not handled as any other 207c claim would be handled, and was treated differently due to the fact that it involved the mental health of an officer." (*Id.*). During a meeting with Chief Buckner that same day, at which Plaintiff was not permitted to have a union representative present, Chief Buckner "threatened Plaintiff with discipline for her October 15 and December 9 emails" and "ordered her to 'knock that kind of stuff off' and 'keep it to yourself.'" (Dkt. No. 12-2, ¶ 37). Chief Buckner asked Plaintiff if she "was 'trying to get promoted writing this kind of stuff.'" (*Id.*). When "Plaintiff expressed that she felt Buckner was retaliating against her . . . instead of considering her complaint seriously," Chief Buckner "replied 'call it whatever you want to call it.'" (*Id.*).

On December 16, Piedmonte "followed up" on the request for the "documentation the Department relied on in reaching their decision" to deny Plaintiff's § 207-c claim for benefits and noted "his concern that further delays in production could jeopardize Plaintiff's right to appeal."[6] (*Id.* ¶ 38). Chief Buckner responded that he believed "that the time for appeal had 'long passed.'" (*Id.*). Plaintiff submitted her appeal of the denial to Chief Buckner and the Human Resources Division the same day. (*Id.*).

### D. Modification of Consent Decree and February and June 2021 Sergeant Promotion Decisions

In 1980, Defendants "entered into a Consent Order to correct discriminatory policies against women and minorities." (*Id.* ¶ 39); *see Alexander v. Bahou*, 512 F. Supp. 3d 363 (N.D.N.Y. 2021) (discussing consent decree entered in 1980 and granting, in part, the United States Department of Justice's motion to modify the consent decree). On January 12, 2021, United States District Judge David N. Hurd modified the consent decree allowing the City to "continue to institute hiring preferences, and . . . continue to maintain separate eligibility lists for

---

[6] The Proposed Amended Complaint does not indicate to whom Piedmonte directed his December 16, 2020 communication.

African Americans and women" but advising that "should it do so, it must be ready to defend those eligibility lists on their merits without the consent decree's protection." *Alexander*, 512 F. Supp. 3d at 378. Judge Hurd explained that he was "satisfied that this modification will allow the city to continue to strive to improve diversity while addressing the Court's own concerns that its authority would otherwise be used to shelter unlawful conduct." *Id.*[7]

According to the Complaint, the City maintains a chart showing "a breakdown of officers, sergeants, lieutenants, captains, and chiefs" that "indicates both the number and percentage of officers who are African-American and women." (Dkt. No. 12-2, ¶ 42). The chart "identifies a 'target' percentage' —one that matches their percentage of the population in the community at large." (*Id.*). "[T]he 'target' for African-American sergeants is 27.9% (then current actual was 1.92%) and women 52.8% (then current actual total was 5.77%). (*Id.*). Chief Buckner stated in a declaration submitted in connection with the recent modification of consent decree that "he has applied a 'minority hiring preference' in the Police Department." (*Id.*).

Plaintiff filed a Notice of Claim on January 15, 2021 alleging "discrimination based on disability and gender." (*Id.* ¶ 46).

On February 18, 2021, Defendants promoted a Black female officer "who scored lower on the Civil Service test than Plaintiff and had 10 fewer years time and experience than her." (*Id.* ¶ 44). "Higher scoring men were skipped over in favor of" the Black female officer. (*Id.*). Plaintiff asserts that "[b]y promoting this officer, the City obtained an increase in both minority

---

[7] Judge Hurd modified "Paragraph 1(a) of the consent decree" as follows:

> The City shall have the right, to the extent necessary to meet its obligations and goals under this decree, to grant priority to African Americans and females who have successfully passed the applicable civil service examinations, which preference will operate in a matter analogous, but not identical, to the priority which has been given to City residents over non-resident applicants (as more particularly set forth in paragraph 7). Nothing in this consent decree, including the allowances of hiring preferences in this Paragraph, Paragraph 7, and Paragraph 8(b), shall be construed as insulating the City from a civil suit for applying differing cutoff scores for the civil service examination on the basis of race or gender, including for African American and female applicants.

*Alexander*, 512 F. Supp. 3d at 378.

categories that they could not obtain by hiring either an African-American man or a White woman." (*Id.*).

On March 1, 2021, Plaintiff filed a complaint with the New York State Division of Human Rights ("NYSDHR") alleging disability discrimination. (*Id.* ¶ 47). On April 21, 2021, on Plaintiff's request for administrative convenience dismissal, the NYSDHR dismissed her complaint. (*Id.*). On June 7, 2021, the Equal Employment Opportunity Commission ("EEOC") issued a right to sue letter. (*Id.*).

On June 22, 2021, "Defendants yet again passed Plaintiff over for promotion" and promoted "[t]hree White male officers" instead. (*Id.* ¶ 48).

## III.   STANDARD OF REVIEW

### A.   Motion to Dismiss – Fed R. Civ. P. 12(b)(6)

To survive a motion to dismiss under Rule 12(b)(6) for failure to state a claim, "a complaint must provide 'enough facts to state a claim to relief that is plausible on its face.'" *Mayor & City Council of Balt. v. Citigroup, Inc.*, 709 F.3d 129, 135 (2d Cir. 2013) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). The plaintiff must provide factual allegations sufficient "to raise a right to relief above the speculative level." *Id.* (quoting *Twombly*, 550 U.S. at 555). The Court must accept as true all factual allegations in the complaint and draw all reasonable inferences in the plaintiff's favor. *See EEOC v. Port Auth.*, 768 F.3d 247, 253 (2d Cir. 2014) (citing *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007)). However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

### B.   Motion to Amend – Fed. R. Civ. P. 15

In general, leave to amend should be freely given "when justice so requires." Fed. R. Civ. P. 15(a)(2). "Where plaintiffs seek to amend their complaint while a motion to dismiss is pending, a court 'has a variety of ways in which it may deal with the pending motion to dismiss,

from denying the motion as moot to considering the merits of the motion in light of the amended complaint.'" *Haag v. MVP Health Care*, 866 F. Supp. 2d 137, 140 (N.D.N.Y. 2012) (quoting *Roller Bearing Co. of Am., Inc. v. Am. Software, Inc.*, 570 F. Supp. 2d 376, 384 (D. Conn. 2008)). Since Defendants have had a full opportunity to respond to the proposed amendments and the primary claims remain the same,[8] the Court considers the merits of the motion to dismiss in light of the Proposed Amended Complaint. If the claims in the proposed amended complaint cannot survive the motion to dismiss, then Plaintiffs' cross-motion to amend will be denied as futile. *See Dougherty v. Town of N. Hempstead Bd. of Zoning Appeals*, 282 F.3d 83, 88 (2d Cir. 2002) ("An amendment to a pleading will be futile if a proposed claim could not withstand a motion to dismiss pursuant to Rule 12(b)(6).").

## IV.    DISCUSSION

### A.    Materials Outside the Complaint

In support of their motion to dismiss, Defendants submit a transcript of Plaintiff's testimony taken pursuant to New York General Municipal Law § 50-h on April 21, 2021 ("50-h Transcript"); Plaintiff's January 15, 2021 Notice of Claim; Plaintiff's March 1, 2021, NYSDHR complaint; the NYSDHR Order of Dismissal for Administrative Convenience dismissing Plaintiff's NYSDHR complaint; the Collective Bargaining Agreement ("CBA") between the City and the Syracuse Police Benevolent Association ("PBA"); the "policy negotiated between the City and the PBA for the administration of benefits pursuant to N.Y. Gen. Mun. Law § 207-c"; a copy of Plaintiff's September 6, 2016 application for § 207-c benefits; and copies of Plaintiff's October 15 and December 9, 2020 emails. (Dkt. No. 7-1; Dkt. No. 7-2). Plaintiff objects to the Court's consideration of her 50-h Transcript but otherwise does not respond to Defendants' submissions. (Dkt. No. 12-3, at 4–6).

---

[8] In the Proposed Amended Complaint, Plaintiff withdraws the intentional infliction of emotional distress claim and dismisses Michca Ballard-Fortin as a Defendant. (Dkt. No. 12-2).

"Generally, consideration of a motion to dismiss under Rule 12(b)(6) is limited to consideration of the complaint itself." *Faulkner v. Beer*, 463 F.3d 130, 134 (2d Cir. 2006). However, considering "materials outside the complaint is not entirely foreclosed on a 12(b)(6) motion." *Id.* A complaint "is deemed to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference." *Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 230 (2d Cir. 2016) (quoting *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002)). "Where a document is not incorporated by reference, the court may nevertheless consider it where the complaint relies heavily upon its terms and effect, thereby rendering the document integral to the complaint." *Id.* (quoting *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010) (internal quotation marks omitted)). Even where a document is integral to the complaint, it must be "clear" that "no dispute exists regarding the authenticity or accuracy of the document" and that "there exist no material disputed issues of fact regarding the relevance of the document." *Faulkner*, 463 F.3d at 134. "[I]f material is not integral to or otherwise incorporated in the complaint, it may not be considered unless the motion to dismiss is converted to a motion for summary judgment and all parties are 'given a reasonable opportunity to present all the material that is pertinent to the motion.'" *Id.* (quoting Fed. R. Civ. P. 12(d)).

The Court finds no basis for considering the 50-h Transcript. Neither the Complaint nor the Proposed Amended Complaint appears to rely on the 50-h Transcript and the transcript is not referenced in either document. *See Azurdia v. City of New York*, No. 18-cv-04189, 2019 WL 1406647, at *4, 2019 U.S. Dist. LEXIS 52967, at *12–13 (E.D.N.Y. Mar. 28, 2019) (refusing to consider transcripts of 50-h hearings, noting that the plaintiffs referred "to the § 50-h hearings just once in their complaint: to reaffirm that they have complied with all of the conditions precedent to filing a lawsuit against the City," and there was no basis "to conclude that plaintiffs relied upon this testimony in drafting their complaint").

The Court considers Plaintiff's January 15, 2021 Notice of Claim, Plaintiff's March 1, 2021, NYSDHR complaint, and the NYSDHR Order of Dismissal for Administrative Convenience dismissing Plaintiff's NYSDHR complaint. These documents are referenced in the Complaint and Proposed Amended Complaint for the purpose of showing Plaintiff complied with the prerequisites for filing suit, (Dkt. No. 2, ¶¶ 46–47; Dkt. No. 12-2, ¶¶ 46–47). *See, e.g.*, *Lipford v. City of Rochester*, No. 16-cv-6266, 2017 WL 4344633, at *3, 2017 U.S. Dist. LEXIS 161262, at *8–9 (W.D.N.Y. Sept. 29, 2017) ("Plaintiff refers to the Notice of Claim in his Complaint and, under the principles discussed above, the Court may properly consider it in deciding Defendants' Motion to Dismiss."). Importantly, there is no dispute regarding the authenticity or accuracy of these documents. (*See, e.g.*, Dkt. No. 12-3, at 15–18 (discussing Notice of Claim)). The Court considers these documents for the facts that the Notice of Claim and NYSDHR complaint were filed and dismissed but "without regard to the truth of [the] contents." *Saudagar v. Walgreens Co.*, No. 18-cv-437, 2019 WL 498349, at *4, 2019 U.S. Dist. LEXIS 20967, at *9 (S.D.N.Y. Feb. 8, 2019) (quoting *Staehr v. Hartford Fin. Servs. Grp., Inc.*, 547 F.3d 406, 425 (2d Cir. 2008)); *see id.* (taking judicial notice of "the NYSDHR Order and the EEOC Notice").

The Complaint and Proposed Amended Complaint rely on the CBA in connection with Plaintiff's tortious interference claim, (Dkt. No. 2, ¶ 90; Dkt. No. 12-2, ¶¶ 89–91 ("Defendants intentionally and maliciously interfered with Plaintiff's employment with the City of Syracuse and the Collective Bargaining Agreement between Defendant City and the City of Syracuse Police Benevolent Association.")), and there is no dispute as to authenticity or accuracy. Accordingly, the Court may consider the CBA. *See Moore-Callands v. City of Danbury*, No. 3:19-cv-00312, 2019 WL 10630389, at *3, 2019 U.S. Dist. LEXIS 233592, at *9–10 (D. Conn. Aug. 5, 2019) ("[B]ecause several of Moore-Callands['] allegations are governed by sections in the CBA, the CBA is 'a document[ ] incorporated in [the Complaint] by reference,' and can be

considered in the court's determination of the within motion." (quoting *Coal for Competitive Elec. v. Zibelman*, 906 F.3d 41, 49 (2d Cir. 2018))) (internal citation omitted).

The Proposed Amended Complaint specifically alleges that "Defendants failed to notify Plaintiff of their '207-c policy'" and did not make it available until December 2020. (Dkt. No. 12-2, ¶ 99). Given this allegation and the absence of any indication in the Complaint or Proposed Amended Complaint that Plaintiff saw or relied on this policy in drafting either pleading or that the § 207-c policy at issue was "negotiated between the City and the PBA for the administration of benefits pursuant to N.Y. Gen. Mun. Law § 207-c," the Court declines to consider it in connection with Defendants' motion to dismiss. The Court likewise declines to consider Plaintiff's "September 6, 2016 application for § 207-c benefits." (Dkt. No. 7-2, at 72–77). Nowhere does the Complaint or Proposed Amended Complaint allege the date Plaintiff applied for § 207-c benefits. The Proposed Amended Complaint refers to an application for § 207-c benefits, but does so in connection with her allegation that "her doctor took her out of work in February 2016" and her request to "return to work" in March 2016, (Dkt. No. 12-2, ¶ 24), raising a question as to the accuracy of the date on the application Defendants have submitted. Accordingly, the Court declines to consider the § 207-c policy or application.

Finally, the Court accepts and will consider Defendants' proffered copies of Plaintiff's October 15 and December 9, 2020 emails. (Dkt. No. 7-2, at 79–82). The Complaint and Proposed Amended Complaint rely heavily on the terms and effects of both emails as the basis for Plaintiff's alleged protected activity in this case. (Dkt. No. 2, ¶¶ 35, 37; Dkt. No. 12-2, ¶¶ 35, 37). Moreover, Plaintiff has not objected to, and relies on, Defendants' proffered emails in her memorandum of law. (Dkt. No. 12-3, at 2). As both emails are integral to the pleadings and there is no dispute as to authenticity or accuracy, the Court may properly consider them in connection with the pending motion.

13

**B.      NYSHRL Racial Discrimination Claim – Notice of Claim**

Defendant seeks dismissal of Plaintiff's NYSHRL race discrimination claim on the ground that Plaintiff failed to "file a written, verified claim as is required by law." (Dkt. No. 7-3, at 14). Plaintiff filed a Notice of Claim on January 15, 2021, prior to the alleged race discrimination in connection with the February 2021 promotion. Plaintiff does not dispute that her Notice of Claim did not allege race discrimination, (*see* Dkt. No. 7-1, at 18–26); instead, Plaintiff argues that the City's Notice of Claim requirement, contained in § 8-115 of the Syracuse City Charter, which imposes a three-month deadline to file a Notice of Claim, is preempted by New York law, which does not require the filing of a notice of claim as a prerequisite to suit and provides a three-year statute of limitations. (Dkt. No. 12-3, at 16 & n.4 (citing *Mascola v. City Univ. of New York*, 14 A.D.3d 409, 409 (N.Y. App. Div. 2005) (three-year statute of limitations)). Defendant replies that Plaintiff's argument is not supported by New York law. (Dkt. No. 13, at 11–12). The Court agrees.

Plaintiff argues that because her state race discrimination claims are governed by the NYSHRL, which allows a three-year statute of limitations and requires no filing of a notice of claims, the Syracuse City Charter impermissibly attempts to "supersede New York State Laws." (Dkt. No. 12-3, at 16). However, it is well settled that "[c]ompliance with the [Syracuse City Charter's] notice of claim clause, unless waived, is a condition precedent to the commencement of litigation against the City." *Davis-Wallbridge, Inc. v. City of Syracuse*, 522 N.E.2d 1034, 1035 (N.Y. 1988). In *Blackmon v. City of Syracuse*, the plaintiffs raised an identical argument. Brief of Plaintiffs-Appellants, *Blackmon v. City of Syracuse*, 2019 WL 8989645, at *10–16 (filed October 9, 2019). The Fourth Department, while it did not expressly address this argument, nonetheless rejected the plaintiffs' argument that they were "not required" to file a notice of claim, explaining that while "the notice of claim provisions of General Municipal Law §§ 50-e and 50-i are inapplicable to State claims under the Human Rights Law," the Syracuse City Charter § 8-

115-3 encompassed the plaintiffs' "causes of action under the Human Rights Law." *Blackmon v. City of Syracuse*, 185 A.D.3d 1505, 1507 (N.Y. App. Div. 2020). New York courts have consistently rejected arguments that the notice of claim and statute of limitations provisions in municipal charters are unenforceable. *See Farrell v. City of Kingston*, 156 A.D.3d 1269, 1272 (N.Y. App. Div. 2017) ("[I]nasmuch as respondent's charter predates enactment of the provisions set forth in General Municipal Law § 50-e (4) and was not expressly super[s]eded or repealed thereby, nor inconsistent therewith, the applicable notice of claim condition remains valid and enforceable."); *Sullivan v. City of Watervliet*, 285 A.D. 179, 181 (N.Y. App. Div. 1954) ("It is our opinion that had the Legislature, by the enactment of section 50-e, intended to repeal the various Statutes of Limitations contained in State laws and municipal charters it would have plainly said so.").[9] Accordingly, Plaintiff's state law race discrimination claims are dismissed.

### C.    Statute of Limitations – Disability Discrimination – Denial of § 207-d Benefits

Defendants argue Plaintiff's claim that she was "was discriminatorily denied 207-c benefits" is barred by the three-year statute of limitations applicable to claims brought under 42 U.S.C. § 1983 and the NYSHRL. (Dkt. No. 7-3, at 15). *Lucente v. Cty. of Suffolk*, 980 F.3d 284, 308 (2d Cir. 2020) ("The statute of limitations for § 1983 actions arising in New York is three years."); N.Y. C.P.L.R. § 214(2). Plaintiff responds that dismissal on statute of limitations grounds is inappropriate at the complaint stage and that, in any event, her claim is timely. (Dkt. No. 12-3, at 10–11).

---

[9] The Fourth Department cited both *Matter of Farrell*, 156 A.D.3d at 1272 and *Picciano v. Nassau Cty. Civil Serv. Comm'n*, 290 A.D.2d 164, 170 (N.Y. App. Div. 2001), in support of its conclusion that the plaintiffs' state discrimination claims were subject to the Syracuse City Charter's notice of claim requirement, reflecting its implicit rejection of the plaintiffs' arguments that the Syracuse City Charter was unenforceable in light of New York's other statutory provisions. *Blackmon*, 185 A.D.3d at 1507.

"Although the statute of limitations is ordinarily an affirmative defense that must be raised in the answer, a statute of limitations defense may be decided on a Rule 12(b)(6) motion if the defense appears on the face of the complaint." *See Connecticut Gen. Life Ins. Co. v. BioHealth Lab'ys, Inc.*, 988 F.3d 127, 131–32 (2d Cir. 2021) (quoting *Thea v. Kleinhandler*, 807 F.3d 492, 501 (2d Cir. 2015)). According to the Complaint, filed on June 28, 2021, Chief Buckner first advised Plaintiff that her § 207-c claim for benefits was denied in December 2020. (Dkt. No. 2, ¶ 37). Defendants argue that any claim in connection with Plaintiff's § 207-c application for benefits accrued during the first half of 2016, more than four years before she filed the Complaint. Specifically, Defendants note that Plaintiff filed her § 207-c application in March 2016, at the latest, and that "the 207-c policy negotiated by the City and the PBA" authorized Plaintiff to file an Article 78 proceeding in the event the Chief of the SPD did not render a decision within sixty days. (Dkt. No. 7-3, at 15). "Under federal law, which governs the accrual of claims brought under § 1983, a claim accrues once the plaintiff knows or has reason to know of the injury which is the basis of [her] action." *Veal v. Geraci*, 23 F.3d 722, 724 (2d Cir. 1994) (internal citations and quotation marks omitted). Even if the Court could take judicial notice of the "§ 207-c policy," given the allegation that Chief Buckner did not advise Plaintiff until December 2020 that her § 207-c application had been denied, (Dkt. No. 2, ¶ 37), as well as the allegation that prior to the December 2020 determination, the director of human resources "repeatedly advised" Plaintiff "that no decision had yet been made," (Dkt. No. 12-2, ¶ 38), Defendants' statute of limitations defense cannot be decided on the face of the Complaint. *See Casale v. Reo*, 522 F. Supp. 2d 420, 425 (N.D.N.Y. 2007) (explaining in civil rights case that "[t]he statute of limitations begins to run when the claim accrues" and finding that "[a]ccrual occurred when Plaintiff received notice of the adverse action, not when the transfer actually took place" (citing *Deters v. City of Poughkeepsie*, 150 F. App'x 10 (2d Cir. 2005))); *see also Schenker AG v. Societe Air France*, 102 F. Supp. 3d 418, 422 (E.D.N.Y. 2015) ("A motion to

dismiss based on the statute of limitations may be granted only if "there is no factual question as to whether the alleged violations occurred within the statutory period[.]" (quoting *Clement v. United Homes, LLC*, 914 F. Supp. 2d 362, 369 (E.D.N.Y. 2012))). Accordingly, Defendants' motion is denied.

### D.     Federal Racial Discrimination Claims

Defendants argue that Plaintiff fails to allege sufficient facts in support of her claim that she was denied a promotion based on race, in violation of the Equal Protection Clause of the Fourteenth Amendment and § 1981.[10] (Dkt. No. 7-3, at 11–14). Plaintiff opposes Defendants' motion. (Dkt. No. 12-3, at 12–15).

A race discrimination claim "is subject to the burden-shifting evidentiary framework set forth in *McDonnell Douglas*." *Littlejohn v. City of New York*, 795 F.3d 297, 312 (2d Cir. 2015) (applying burden-shifting framework to claims under § 1981 and § 1983). As this motion is one to dismiss, however, the Court "focus[es] only on whether the allegations in the complaint give plausible support to the reduced prima facie requirements that arise under *McDonnell Douglas* in the initial phase of a litigation." *Id.* Thus, to defeat a motion to dismiss, "a plaintiff must plausibly allege that (1) the employer took adverse action against him, and (2) his race, color, religion, sex or national origin was a motivating factor in the employment decision." *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 87 (2d Cir. 2015). The plaintiff may meet the burden of showing a motivating factor "by alleging facts that directly show discrimination or facts that indirectly show discrimination by giving rise to a plausible inference of discrimination." *Id.* A complaint is sufficient "if it pleads specific facts that support a minimal plausible inference of such discrimination." *Doe v. Columbia Univ.*, 831 F.3d 46, 56 (2d Cir. 2016).

---

[10] There is no argument that a notice of claim was required for Plaintiff's federal race discrimination claims. *See Blackmon*, 185 A.D.3d at 1507 ("We agree with plaintiffs that they did not need to file a notice of claim with respect to their Federal discrimination claims." (citing *Felder v. Casey*, 487 U.S. 131, 151–53 (1988))).

The crux of Defendants' motion is that while the Proposed Amended Complaint alleges that a Black police officer was promoted in February 2021, it also alleges that Defendants promoted "numerous White male officers"—in August and October 2020 and June 2021—thereby undermining any inference of racial discrimination. (Dkt. No. 12-2, ¶ 44). For convenience, the Court begins with the February 2021 promotion: drawing all inferences from the facts surrounding this promotion in Plaintiff's favor, it is plausible to infer that Plaintiff was not promoted because she is white. The Proposed Amended Complaint alleges that in or about October 2020, the City "resisted" a motion by the United States Department of Justice ("DOJ") to "dissolve the 1980 Consent Decree," (*id.* ¶ 41), which had permitted the City "to institute a hiring preference for African American and women candidates." *Alexander*, 512 F. Supp. 3d at 367.[11] In opposing the DOJ's motion, Chief Buckner submitted a declaration stating that he has "applied a 'minority hiring preference' in the Police Department." (Dkt. No. 12-2, ¶ 42). In January 2021, Judge Hurd granted the DOJ's motion, in part, and modified the Consent Decree, "such that the City may no longer rely on it as a defense for applying differing Civil Service cutoff scores on the basis" of race or gender. (*Id.* ¶ 43); *see Alexander*, 512 F. Supp. 3d at 378 (granting the government's motion to modify the consent decree, finding that "the government has made an adequate showing that the city's practice of using separate eligibility lists for women and African American candidates for police . . . work, a practice empowered by the consent decree, violates Title VII"). The Proposed Amended Complaint further alleges that the City maintains a chart showing its shortcomings in its target for African-American sergeants—target of 27.9% (then current actual was 1.92%) and women—target 52.8% (then current actual total was 5.77%), and that Defendants hired a Black woman (leading to statistical increase in both categories) one month later "who scored lower on the Civil Service test than Plaintiff" and

---

[11] There is no argument that the Consent Decree prohibits the claims in this case.

had less experience. (*Id.* ¶¶ 42, 44). While the hiring of white officers in October 2020 and June 2021 certainly raises a factual issue, against the backdrop of the motion to modify and modification of the Consent Decree, Chief Buckner's expressed "minority hiring preference," and the City's chart, which showed that its percentage of Black sergeants was even further below target that its percentage of female sergeants, the allegation that Defendants gave the sergeant promotion to a Black female officer, even though Plaintiff was the more qualified of the two, is sufficient to allege a plausible inference of racial discrimination in connection with the February 2021 promotion decision. *Vill. of Freeport v. Barrella*, 814 F.3d 594, 601 n.9 (2d Cir. 2016) ([T]he fact that an employer favored someone outside of the relevant protected class 'will ordinarily suffice' to sustain an inference of discrimination." (quoting *Littlejohn*, 795 F.3d at 313)).

These allegations are less potent when considered in connection with the August and October 2020 and June 2021 promotions because it appears Defendants gave at least several of these promotions to *white* male officers.[12] Nonetheless the Court finds the allegations sufficient to allow a plausible inference of racial discrimination. When viewed as a whole, the Proposed Amended Complaint alleges that of the ten officers promoted to sergeant from June 2020 to June 2021, nine were male, and the only female promoted was Black, (Dkt. No. 12-2, ¶¶ 33, 44, 48). *See Vega*, 801 F.3d at 87 (noting that a plaintiff can allege discrimination through a 'mosaic' of intentional discrimination by identifying 'bits and pieces of evidence' that together give rise to an inference of discrimination" (quoting *Gallagher v. Delaney*, 139 F.3d 338, 342 (2d Cir. 1998))). Given Chief Buckner's employment of a "minority hiring preference," which it is reasonable to infer continued even after the modification of the Consent Decree in January 2021 based on the promotion of a Black officer in February 2021, and the City's chart showing it was

---

[12] The Proposed Amended Complaint alleges that three of the male officers were white, (Dkt. No. 12-2, ¶ 48), but does not allege the race of the other male officers.

more deficient in its promotion of Black officers to sergeant than in its promotion of women, it is plausible to infer that Plaintiff was discriminated against because she was not Black. *See Lai v. Deiorio Foods Inc.*, No. 15-cv-0195, 2016 WL 814930, at *5, 2016 U.S. Dist. LEXIS 25160, at *16 (N.D.N.Y. Feb. 29, 2016) ("Plaintiff does not necessarily allege that she was discriminated against because of her Vietnamese heritage, but does allege facts to suggest that she was discriminated against because she was not Bosnian, the preferred national origin of her line supervisor."). Accordingly, Defendants' motion to dismiss Plaintiff's federal claims of racial discrimination is denied.

### E.   ADA, RHA, Fourteenth Amendment, and NYSHRL Retaliation Claims

Defendants argue that all of Plaintiff's retaliation claims fail because (1) neither the October 15, 2020 email nor the December 9, 2020 email constitutes protected activity, and (2) Plaintiff fails to allege a causal connection between her emails and any adverse employment action. (Dkt. No. 7-3, at 16–19). Plaintiff opposes Defendants' motion. (Dkt. No. 12-3, at 19–25).

"[T]o survive a motion to dismiss, the plaintiff must plausibly allege that: (1) defendants discriminated—or took an adverse employment action—against [her], (2) 'because' [she] has opposed any unlawful employment practice." *Vega*, 801 F.3d at 91; *see also id.* ("[T]he elements of a retaliation claim based on an equal protection violation under § 1983 mirror those under Title VII."); *Sivio v. Vill. Care Max*, 436 F. Supp. 3d 778, 798 (S.D.N.Y. 2020) (observing that the plaintiff's ADA, RHA, and NYSDHR claims of "retaliation are analyzed under the same burden-shifting framework established for Title VII cases" (quoting *Treglia v. Town of Manlius*, 313 F.3d 713, 719 (2d Cir. 2002))).

Defendants address protected activity and causal connection in a wholesale manner; they make no delineation between Plaintiff's claims of retaliation for engaging in protected activity concerning her alleged disability—ADA and RHA claims—and claims of retaliation for

complaining about gender-based discrimination—Fourteenth Amendment and NYSDHR retaliation claims.

### 1.    Protected Activity

Defendants argue that because Plaintiff's alleged protected activities, her October 15 and December 9 emails to Chief Buckner, "can only be described as 'disruptive' and/or 'insubordinate,'" the Proposed Amended Complaint fails to allege protected activity as a matter of law. (Dkt. No. 7-3, at 17). In support of their argument, Defendants cite the following excerpts from the October 15 email: "Let me start off by relaying to you all how disgusted I am," "you are incapable of doing the right thing," and characterizing the actions toward her as "cowardly." (Dkt. No. 7-2, at 79; *see also id.* at 81 (December 9 email: "This entire process has been extremely frustrating, absolutely unfair and discriminatory towards me.")).

"With respect to protected activity, '[a] complaint can be informal—an employee does not need to lodge a formal complaint of discrimination.'" *Vale v. Great Neck Water Pollution Control Dist.*, 80 F. Supp. 3d 426, 439 (E.D.N.Y. 2015) (quoting *Bowen–Hooks v. City of New York*, 13 F. Supp. 3d 179 (E.D.N.Y. 2014) (analyzing Title VII)). "Employees engage in protected activity when they 'ha[ve] a good faith, reasonable belief' that they have made a complaint 'opposing an employment practice made unlawful' by . . . the ADA." *Salas v. New York City Dep't of Investigation*, 298 F. Supp. 3d 676, 685 (S.D.N.Y. 2018) (quoting *Kelly v. Howard I. Shapiro & Assocs. Consulting Eng'rs, P.C.*, 716 F.3d 10, 14 (2d Cir. 2013)).

The Second Circuit has recognized that "not all forms of protest are protected by [the statutory] prohibition on retaliation" and noting that "the way in which an employee presses complaints of discrimination can be so disruptive or insubordinate that it strips away protections against retaliation." *Matima v. Celli*, 228 F.3d 68, 79 (2d Cir. 2000) (quoting *Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 566 (2d Cir. 2000)). "The anti-retaliation provision of [the civil rights statutes are] not a license for offensive, disruptive, rude, or demeaning behavior." *Finn v. New*

*York State Off. of Mental Health-Rockland Psychiatric Ctr.*, No. 08-cv-5142, 2011 WL 4639827, at *18, 2011 U.S. Dist. LEXIS 115950, at *50 (S.D.N.Y. Oct. 6, 2011), *aff'd*, 489 F. App'x 513 (2d Cir. 2012).

Plaintiff's October 15, 2020 email is lengthy and while it contains language that might be construed as inflammatory it also reflects Plaintiff's concern that she was not "being promoted" "due to the fact that I have been diagnosed with Post Traumatic Stress Disorder," concern that Defendants were not helping officers when they have mental health issues "due to the repeated trauma that they are subjected to on a day to day basis," and request for the restoration of her medical and other leave. (Dkt. No. 7-2, at 79). Like the October 15, email, the December 9 email contains language that might be construed as rude or demeaning, but it, too, is lengthy and voices her frustration with Defendants' handling of her application for 207-c benefits, appeals the denial of her application, and notifies Defendants of her belief that she was "treated differently due to the fact that . . . the mental health of an officer" was involved. (*Id.* at 81). Drawing all reasonable inferences in Plaintiff's favor, *see EEOC v. Port Auth.*, 768 F.3d at 253, the Court cannot say that Plaintiff's emails are so disruptive or insubordinate so as to "strip away" the protections of the civil rights retaliation laws. *Matima*, 228 F.3d at 79. Such a determination is highly factual and inappropriate at the pleading stage. *Cf. Sanders v. Madison Square Garden, L.P.*, No. 06-cv-589, 2007 WL 2254698, at *22, 2007 U.S. Dist. LEXIS 57319, at *68 (S.D.N.Y. Aug. 6, 2007) (concluding that the issue of "whether plaintiff's conduct was so disruptive as to strip it of the protection afforded by Title VII is an issue that is best left for jury determination . . . and is improper for resolution on summary judgment," explaining that "[t]he line between protected opposition and disruptive conduct is not sufficiently clear to allow the Court to determine as a matter of law that plaintiff's conduct was protected" (citing *Matima*, 228 F.3d at 80-81)), *opinion withdrawn in part on other grounds*, 525 F. Supp. 2d 364 (S.D.N.Y. 2007). Accordingly, Defendants' motion on this ground is denied.

### 2.   Causal Connection

Defendants argue that Plaintiff fails to allege causal connection between the protected activity, the October 15, 2020 and December 9, 2020 emails, and the alleged adverse action, denial of promotion to sergeant, because Plaintiff sent the emails sent *after* she "had already twice been passed over for promotions." (Dkt. No. 7-3, at 22–23). Specifically, Defendants argue Plaintiff was denied a promotion beginning in August 2020, and such denial continued in October 2020, February 2021, and June 2021. (*Id.*). Plaintiff opposes Defendants' motion and argues: (1) that her protected activities also included Piedmonte's November 25 and December 2, 2020 emails, her January 15, 2021 Notice of Claim, and her March 1, 2020 NYSDHR complaint[13] and (2) that there is a causal connection between these additional protected activities and the June 2021 promotion denial. (Dkt. No. 12-3, at 24).

"To adequately plead causation, 'the plaintiff must plausibly allege that the retaliation was a 'but-for' cause of the employer's adverse action." *Duplan v. City of New York*, 888 F.3d 612, 625 (2d Cir. 2018) (quoting *Vega*, 801 F.3d at 90). However, "'[b]ut-for' causation does not . . . require proof that retaliation was the only cause of the employer's action, but only that the adverse action would not have occurred in the absence of the retaliatory motive." *Id.* (quoting *Vega*, 801 F.3d at 91). "Where timing is the only basis for a claim of retaliation, and gradual adverse job actions began well before the plaintiff had ever engaged in any protected activity, an inference of retaliation does not arise." *Slattery v. Swiss Reinsur. Am. Corp.*, 248 F.3d 87, 95 (2d Cir. 2001). "Consistent with this logic, the courts have found that where even very close temporal proximity exists, the requisite causal connection will falter if the employer's complained-of conduct"—including, for example, failure to hire—began before the employee's corresponding protected activity. *Wang v. Palmisano*, 157 F. Supp. 3d 306, 327 (S.D.N.Y. 2016)

---

[13] Defendants have not addressed whether these activities constitute protected activities.

(explaining that in the "context of a failure-to-hire claim, a decision not to hire—if initially made before the relevant protected activity occurred—will not give rise to an inference of retaliation when the prospective employer persists in refusing to hire the prospective employee after the protected activity").

### a.      August and October 2020 Promotions

The Proposed Amended Complaint does not allege that Plaintiff engaged in any protected activity prior to the August or October 2020 promotion decisions. Indeed, in her memorandum of law, Plaintiff's retaliation arguments solely concern the February and June 2021 promotion decisions. (Dkt. No. 12-3, at 24). Accordingly, to the extent the Proposed Amended Complaint alleges gender- or disability-based retaliation in connection with the August and October 2020 promotion decisions, such claims are dismissed.

### b.      February and June 2021 Promotions

The three to five months between Plaintiff's alleged protected activity in October and December 2020 and the February 2021 denial of promotion allow a plausible inference of causal connection and retaliatory purpose in connection with the February 2021 denial of promotion. *See Vega*, 801 F.3d at 90 ("A retaliatory purpose can be shown indirectly by timing: protected activity followed closely in time by adverse employment action."); *see also Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 110 (2d Cir. 2010) ("Though this Court has not drawn a bright line defining, for the purposes of a prima facie case, the outer limits beyond which a temporal relationship is too attenuated to establish causation, we have previously held that five months is not too long to find the causal relationship.").

The Court has considered Defendants' argument that the denial of promotion was part of a continuous denial of promotion that began months before Plaintiff's October and December 2020 emails but finds it unavailing at this stage as temporal proximity is not "the only basis" for Plaintiff's retaliation claim. *Slattery*, 248 F.3d at 95. Plaintiff also alleges that, after sending the

December 9, 2020 email appealing the denial of the 207-c benefits and complaining about her treatment, Chief Buckner told Plaintiff to "knock that kind of stuff off" and to "keep it to [her]self," and questioned if "Plaintiff was 'trying to get promoted writing this kind of stuff." (Dkt. No. 12-2, ¶ 37). Defendants argue that there is "an obvious lawful reason" for Chief Buckner's "comments" to Plaintiff: "counseling Plaintiff for insubordinate behavior." (Dkt. No. 13, at 22–23). Though this may be a permissible inference, it is also reasonable to infer that Chief Buckner, who is alleged to be responsible for promotion decisions, in telling Plaintiff to "knock that kind of stuff off" and "keep it to [her]self," was telling Plaintiff not to pursue her appeal of the denial of disability benefits, complain about her treatment, or make claims of disability discrimination. By Plaintiff's account, Chief Buckner made these remarks approximately two months before denying Plaintiff a promotion in February 2021, made them in direct response to her December 9, 2020 email, and specifically referenced Plaintiff's pursuit of promotion. As the Court must draw all reasonable inferences in Plaintiff's favor at this stage, the Court finds the Proposed Amended Complaint sufficiently alleges retaliatory intent.

Defendants have not specifically contested Plaintiff's retaliation claim in connection with the June 2021 denial of promotion. Even assuming the October 15 and December 9, 2020 emails as well as Chief Buckner's comments were insufficient, the three months between Plaintiff's March 1, 2021 NYSDHR complaint and the June 2021 denial of promotion are sufficient to allege causal connection, particularly when viewed together with the allegedly retaliatory denial of promotion in February 2021.

Accordingly, Defendants' motion to dismiss Plaintiff's retaliation claims in connection with the February and June 2021 promotion decisions is denied.

### F.        First Amendment Retaliation

Defendants move to dismiss Plaintiff's First Amendment retaliation claim on the ground that her October 15 and December 9, 2020 emails are not constitutionally protected speech.[14] (Dkt. No. 7-3, at 19–22). Plaintiff responds that "it is clear from the face of the email complaints that Plaintiff's concerns were not limited to herself but rather concerned the treatment of all officers in the department who have suffered or will suffer from disabilities." (Dkt. No. 12-3, at 22).

"To survive a motion to dismiss, a plaintiff claiming that [she] was retaliated against in violation of the First Amendment must plausibly allege that (1) [she] engaged in speech or activity that was protected by the First Amendment; (2) [she] suffered an adverse employment action; and (3) a causal connection existed between the adverse action and the protected activity. *Specht v. City of New York*, 15 F.4th 594, 599–600 (2d Cir. 2021) (citing *Smith v. County of Suffolk*, 776 F.3d 114, 118 (2d Cir. 2015)). As a public employee, plaintiff must allege that she "engaged in citizen speech," in other words, that she "spoke as a private citizen," and that "the speech at issue was on a matter of public concern." *Montero v. City of Yonkers*, 890 F.3d 386, 399 (2d Cir. 2018); *see Specht*, 15 F.4th at 600 ("The speech of a public employee is protected by the First Amendment when the employee speaks as a citizen on a matter of public concern, rather than pursuant to his employment responsibilities."). Whether speech is on a matter of public concern presents a question of law that takes into consideration the content, form, and context of a given statement. *Montero*, 890 F.3d at 399. Speech deals with matters of public concern when it can be fairly considered as relating to matters of political, social, or general interest to the community or value and concern to the public. *See Snyder v. Phelps*, 562 U.S. 443, 453 (2011). As the Second Circuit has explained:

---

[14] There is no claim that any of the activities Plaintiff cites as protected activities in the context of her other retaliation claims, i.e., the Notice of Claim or NYSDHR complaint, are protected activities for purposes of Plaintiff's First Amendment retaliation claim.

> To identify matters of public concern, "we consider the motive of the speaker, cognizant that speech on a purely private matter does not pertain to a matter of public concern and, conversely, that an individual motivated by a personal grievance can simultaneously speak on a matter affecting the public at large[.]"

*Golodner v. Berliner*, 770 F.3d 196, 203 (2d Cir. 2014) (internal quotation marks and alterations omitted).

"For public employees, speech that 'principally focuses on an issue that is personal in nature and generally related to the speaker's own situation or that is calculated to redress personal grievances—even if touching on a matter of general importance—does not qualify for First Amendment protection.'" *Agosto v. New York City Dep't of Educ.*, 982 F.3d 86, 95 (2d Cir. 2020) (quoting *Montero*, 890 F.3d at 399–400). The forum is relevant because a "petition filed with an employer using an internal grievance procedure in many cases will not seek to communicate to the public or to advance a political or social point of view beyond the employment context." *Id.* (quoting *Borough of Duryea, Penn. v. Guarnieri*, 564 U.S. 379, 398 (2011)).

Here, Plaintiff's intended audience for her email included her supervisors. Further, neither the emails themselves nor the allegations in the Proposed Amended Complaint suggest that Plaintiff directed her email to, or intended to reach, the public. Plaintiff argues that her emails are not unlike the complaints of the plaintiff police officer to precinct leadership in *Matthews v. City of New York*, whose speech the Second Circuit found to be protected, 779 F.3d 167, 174–76 (2d Cir. 2015), because she "is not employed to report discrimination within the department and it was not part-and-parcel of her job," (Dkt. No. 12-3, at 23) (internal quotation marks omitted). In *Matthews*, however, the plaintiff police officer reported to precinct leadership "the existence of [a] quota system," which was "a precinct-wide policy," that "he believed was limiting officer discretion to not intervene in situations that, in the officer's own judgment, might not warrant intervention" and that "resulted in stops that were 'unjustified' because no officer properly exercising discretion would have made them." *Matthews*, 779 F.3d at 174–75. By

contrast, Plaintiff's emails concern Defendants' actions toward her in the handling of her

application for § 207-c benefits and application for promotion. *See Specht*, 15 F.4th at 601

(affirming dismissal of First Amendment retaliation claim for failure to allege protected activity

with respect to the plaintiff fire marshal's email to colleagues explaining "[t]hese are internal

workplace grievances, not matters of public concern," and concluding that "[n]either the

substance nor the intended audience of Specht's email—his colleagues—suggests that Specht

sought to inform the public on a matter of political, social, or community interest").

The Proposed Amended Complaint expressly alleges that Plaintiff's motive in sending

the October 15, 2020 email was "to ask why she was repeatedly passed over for promotions in

favor of less qualified candidates and complain that she felt it was related to her PTSD," to

request "her sick time, furlough, and personal days" be returned, and to "express her belief that

the Department's treatment of its officers was having a detrimental effect on morale." (Dkt. No.

12-2, ¶ 35). Plaintiff alleges that she sent the December 9, 2020 email to Chief Buckner to appeal

the decision denying her disability benefits. (*Id.* ¶ 37). Even though Plaintiff's emails touch on

allegations of disability discrimination, their primary aim concerned Defendants' failure to

promote Plaintiff and the handling of her application for disability benefits based on her alleged

on-duty mental health injury. Brief references to discrimination are insufficient to transform

Plaintiff's concerns for her own career and treatment into "speech on a matter of public

concern." *Quinones v. City of Binghamton*, 997 F.3d 461, 467 (2d Cir. 2021) (affirming

dismissal where the allegations in the complaint focused on the plaintiff's "concern about his

own career and his report that one police official speculated that another was racist," explaining

that "[s]uch speech does not implicate the First Amendment."); *see also Ezekwo v. N.Y.C. Health

& Hosps. Corp.*, 940 F.2d 775, 778, 781 (2d Cir. 1991) (finding that employee's statements that

hospital officials had damaged her career as a physician and deprived her of training

opportunities based on "malice, discrimination and conspiracy" did not "address matters of

public concern" because "her primary aim was to protect her own reputation and individual

development"); *Ruotolo v. City of New York*, 514 F.3d 184, 186, 189–90 (2d Cir. 2008) (finding

the plaintiff safety officer failed to allege speech "on a matter of public concern," where speech

consisted of prior lawsuit alleging retaliatory personnel action" that pertained to "the

circumstances . . . of his employment, such as reassignment, transfer, time off, and discipline,"

and sought relief "almost entirely personal to" the plaintiff). Accordingly, Defendants' motion to

dismiss the First Amendment retaliation claim is granted.

### G.     Deputy Chiefs

Defendants move to dismiss Plaintiff's § 1983 and NYSHRL discrimination claims

against the individual Deputy Chiefs—Shoff, McGork, Cecile, and Trudell—on the ground that

Plaintiff fails to allege these individuals participated in discriminatory conduct or "harbored a

discriminatory animus."[15] (Dkt. No. 7-3, at 30–31). Plaintiff opposes dismissal.

The Proposed Amended Complaint alleges that Deputy Chiefs Shoff, McGork, Cecile,

and Trudell violated Plaintiff's Fourteenth Amendment right to equal protection by

discriminating against her based on gender and race and that they violated the NYSHRL by

subjecting Plaintiff to gender and disability discrimination. It is well-settled that, to establish a

defendant's individual liability in a suit brought under § 1983, a plaintiff must show "the

defendant's personal involvement in the alleged constitutional deprivation." *Grullon v. City of

New Haven*, 720 F.3d 133, 138 (2d Cir. 2013) (citations omitted). A plaintiff must "allege a

tangible connection between the acts of a defendant and the injuries suffered." *Bass v. Jackson*,

790 F.2d 260, 263 (2d Cir. 1986). In *Tangreti v. Bachmann*, the Second Circuit held that "there

is no special rule for supervisory liability" and that "a plaintiff must plead and prove 'that each

---

[15] The Deputy Chief Defendants seek dismissal of Plaintiff's claim that they "participated in discriminatory conduct" "based on her protected characteristics." (Dkt. No. 7-3, at 30–31; Dkt. No. 13, at 26–27). As they do not address Plaintiff's claims of retaliation, the Court has not evaluated the viability of those claims as to the Deputy Chief Defendants.

Government-official defendant, through the official's own individual actions, has violated the

Constitution.'" 983 F.3d 609, 618 (2d Cir. 2020) (quoting *Iqbal*, 556 U.S. at 676). Thus, the

"factors" necessary to plead and establish a Section 1983 violation "'will vary with the

constitutional provision at issue' because the elements of different constitutional violations

vary." *Id.* (quoting *Iqbal*, 556 U.S. at 676).

"The NYSHRL allows for individual liability either where an individual defendant is

considered an 'employer,' N.Y. Exec. Law § 296(1)(e), or where the defendant aided and abetted

the unlawful discriminatory acts of an employer, *id.* § 296(6)." *Dodd v. City Univ. of New York*,

489 F. Supp. 3d 219, 268 (S.D.N.Y. 2020); N.Y. Exec. Law § 296(1) ("It shall be an unlawful

discriminatory practice [ ] [f]or an employer . . . because of an individual's . . . disability . . . to

refuse to hire or employ or to bar or to discharge from employment such individual or to

discriminate against such individual in compensation or in terms, conditions or privileges of

employment.").

According to the Proposed Amended Complaint, in June 2020, Chief Buckner and the

Deputy Chiefs interviewed Plaintiff for a sergeant's position. (Dkt. No. 12-2, ¶ 31). The Deputy

Chiefs "provid[ed] input to [Chief Buckner] with respect to who should and shouldn't be

promoted." (*Id.* ¶ 35). In August 2020, a male police officer was promoted to sergeant and in

October 2020, five male officers with lower civil service score and less seniority and experience

than Plaintiff were promoted to sergeant. (*Id.* ¶ 33). When Plaintiff asked Deputy Chief Shoff

why she was not promoted, he responded that it was because of her conversation with Chief

Buckner in 2018, during which she explained that she was working in the records division "due

to her PTSD and depression" and told Chief Buckner that she "still had not received a

determination on her application for § 207-c benefits." (*Id.* ¶ 34).

According to the Proposed Amended Complaint, as a supervisor, Deputy Chief Shoff

"had the power to make personnel decisions regarding Plaintiff's employment." (*Id.* ¶ 10). These

allegations are sufficient at the pleading stage to allege that these Defendants were personally involved both in the decision not to promote Plaintiff in August and October 2020 as well as the decision to promote a total of six male officers with lower scores and less experience than Plaintiff, (*id.* ¶¶ 32–33). *See Peck v. Cnty. of Onondaga*, No. 21-cv-651, 2021 WL 3710546, at *10, 2021 U.S. Dist. LEXIS 157561, at *27–28 (N.D.N.Y. Aug. 20, 2021) ("[F]rom the deferential vantage point of a motion to dismiss, the remaining allegations against Conway sufficiently support personal involvement in constitutional violations for Peck's claims to survive. Reading all inferences in plaintiff's favor, the Court must assume that Conway took Gonzalez's recommendations as to who should be promoted to Sergeant and chose three White people and one Hispanic person for promotion despite plaintiff's superior credentials."); *Tyson v. Town of Ramapo*, No. 17-cv-4990, 2019 WL 1331913, at *17, 2019 U.S. Dist. LEXIS 48875, at *48 (S.D.N.Y. Mar. 25, 2019) (finding the plaintiff sufficiently pleaded that the individual defendants "directly participated in her termination" where the complaint alleged that St. Lawrence, Ullman, Tress, Brendel, and Withers actually terminated her, that Weidel processed her termination, and that they did this knowing that Plaintiff was being treated differently based on her race and gender"); *see also Feingold*, 366 F.3d 138, 158 (2d Cir. 2004) (explaining that, to be an aider and abettor under the NYSHRL, a co-worker must actually participate in the conduct giving rise to the discrimination claim).

The allegation that Defendants hired six less experienced male officers with lower civil service test scores than Plaintiff allows a plausible inference of gender-based discriminatory animus. *See, e.g.*, *Littlejohn*, 795 F.3d at 313 (finding the plaintiff's allegation that she was replaced by a white employee who was less qualified than the plaintiff was "more than sufficient to make plausible her claim that her demotion occurred under circumstances giving rise to an inference of [racial] discrimination"). Moreover, the allegation that the reason Deputy Chief Shoff gave for not promoting Plaintiff in August and October 2020 was her 2018 conversation

with Chief Buckner, when Plaintiff told Chief Buckner she was working in the Records Division

because of her PTSD and depression and reported that her § 207-c benefit application "had still

not" been determined, allows a plausible inference of discriminatory animus as to Deputy Chief

Shoff based on disability for purposes of her NYSHRL disability discrimination claim. *See Fried*

*v. LVI Servs., Inc.*, No. 10-cv-9308, 2011 WL 2119748, at \*7, 2011 U.S. Dist. LEXIS 57639, at

\*22 (S.D.N.Y. May 23, 2011) ("Aiding and abetting liability requires that the aider and abettor

share the intent or purpose of the principal actor, and there can be no partnership in an act where

there is no community of purpose.").

There is, however, no basis on which to infer that Deputy Chiefs McGork, Cecile, or

Trudell acted with disability-based discriminatory animus. Nor are there any allegations that any

of the Deputy Chief Defendants acted with race-based discriminatory animus in connection with

the August and October 2020 promotion decisions. Accordingly, Defendants' motion to dismiss:

the gender discrimination claims against the Deputy Chief Defendants in connection with the

August and October 2020 promotion decisions are denied; the disability-based discrimination

claims in connection with the August and October 2020 promotion decisions is denied as to

Deputy Chief Shoff but granted as to Deputy Chiefs McGork, Cecile, and Trudell; and the race

discrimination claims against the Deputy Chief Defendants in connection with the August and

October 2020 promotion decisions is granted.

While it is reasonable to infer from the allegations in the Proposed Amended Complaint

the Deputy Chiefs' participation in Plaintiff's June 2020 interview for promotion to sergeant and

provision of input to Chief Butler regarding the promotion hiring decisions in August and

October 2020, (*see* Dkt. No. 12-2, ¶ 32 ("In June 2020, Plaintiff was interviewed by Defendants

Buckner, Shoff, McGork, Cecile, and Trudell for the sergeant's position."), ¶ 35 (alleging in

connection with October 2020 promotions that "Defendants Shoff, McGork, Cecile, and Trudell

participated in the promotion selection process")), the only allegations concerning the Deputy

Chiefs' participation in the February and June 2021 promotion decisions are conclusory, (*see id.* ¶ 44 ("On or about February 18, 2021, Defendants promoted a Black female officer."), ¶ 48 ("On June 22, 2021 the Defendants yet again passed Plaintiff over for promotion.")). Absent any factual allegations, the Court concludes that Plaintiff fails to allege Deputy Chiefs Shoff, McGork, Cecile, or Trudell participated in the February and June 2021 promotion decisions. *See In re Fosamax Products Liab. Litig.*, No. 09-cv-1412, 2010 WL 1654156, at *1, 2010 U.S. Dist. LEXIS 37795, at*2–3 (S.D.N.Y. Apr. 9, 2010) ("After the court strips away conclusory allegations, there must remain sufficient well-pleaded factual allegations to nudge plaintiff's claims across the line from conceivable to plausible."). Accordingly, all discrimination claims against the Deputy Chief Defendants in connection with the February and June 2021 promotion decisions are dismissed.

### H.    Tortious Interference

Defendants argue that the Complaint fails to state a claim for tortious interference because: (1) Plaintiff does not allege that the collective bargaining agreement ("CBA") was breached or specify any provisions of the CBA that were supposedly breached, (Dkt. No. 7-3, at 23), and (2) such a claim directly implicates the CBA between the City and the Syracuse Police Benevolent Association and is therefore preempted by the Labor Management Relations Act ("LMRA") § 301, 29 U.S.C. § 185. (Dkt. No. 7-3, at 23–24). In response, Plaintiff submitted the Proposed Amended Complaint, alleging that Defendants tortiously interfered with "Plaintiff's employment with the City of Syracuse and the Collective Bargaining Agreement between Defendant City and the City of Syracuse Police Benevolent Association, to which she is a third-party beneficiary." (Dkt. No. 12-2, ¶ 90). Specifically, Plaintiff alleges that the CBA prohibits discrimination based on gender or race and requires the City "to return to its use of a seniority point system," and that Defendants failed to consider Plaintiff's seniority points in its promotion decisions. (*Id.* (citing CBA, Article 2, Section (B) and Article 26)). In reply, Defendants do not

33

address the provisions of the CBA Plaintiff identified in the Proposed Amended Complaint but continue to argue that the tortious interference claim is preempted by the LMRA. (Dkt. No. 13, at 23–24).

Defendants argue that because this claim concerns a collective bargaining agreement, the LMRA, 29 U.S.C. § 185, preempts it. (Dkt. No. 7-3, at 23–24). Plaintiff responds that the LMRA "does not apply to Plaintiff and cannot pre-empt her claims as the LMRA does not apply to public employees." (Dkt. No. 12-3, at 27 n.7). According to the Proposed Amended Complaint, however, Plaintiff is a public employee of the City of Syracuse, a political subdivision of the State of New York, (*see generally* Dkt. No. 12-2); *see United Bldg. & Constr. Trades Council v. City of Camden*, 465 U.S. 208, 215 (1984) ("[A] municipality is merely a political subdivision of the State from which its authority derives."), and as a public employee, she is excluded from "the ambit of federal regulation." *Malast v. Civil Serv. Emps. Ass'n, Inc.*, 474 F. App'x 829, 830 (2d Cir. 2012). There is, therefore, no basis on which to conclude that Plaintiff's state law claim of tortious interference is preempted by the LMRA. *See id.* (vacating and remanding district court judgment dismissing public employee's state law claims as preempted by the LMRA, explaining "Congress's explicit intention to exclude public employees like Malast from the ambit of federal regulation renders the district court's preemption holding untenable").

Defendants also argue that the tortious interference claim fails because "Defendants are employees of the City" and therefore cannot be held liable. (Dkt. No. 7-3, at 23). "Under New York law, a plaintiff who brings a tortious interference claim must allege that the defendants were not parties to the contract." *Cohen v. Davis*, 926 F. Supp. 399, 404 (S.D.N.Y. 1996). However, "[w]hen the claim arises in the employment context and the defendants are co-employees, the plaintiff must allege that the defendants-employees 'exceeded the bounds of [their] authority' in order to satisfy the 'third-party' requirement." *Id.* (quoting *Finley v. Giacobbe*, 79 F.3d 1285, 1295 (2d Cir. 1996)). "A supervisor is considered to have acted outside

the scope of his employment if there is evidence that the supervisor's manner of interference involved independent tortious acts such as fraud or misrepresentations, or that he acted purely from malice or self-interest." *Id.* (citing *Murtha v. Yonkers Child Care Ass'n, Inc.*, 45 N.Y.2d 913, 915 (N.Y. 1978)). Here, Defendants' argument does not extend beyond the conclusory assertion that the tortious interference claim fails because they are "employees of the City." As outlined, there are circumstances when an employee-defendant may be held liable, and as Defendants have not addressed those circumstances, the Court declines to be the first to undertake that analysis. Accordingly, Defendants' motion to dismiss the tortious interference claim is denied.

## I.     Prima Facie Tort

Plaintiff alleges that Defendants "intended to inflect harm upon the pecuniary interests of Plaintiff" by subjecting her to, inter alia, discrimination and retaliation, and that "Defendants had no legal justification or excuse to act in such manner." (Dkt. No. 12-2, ¶¶ 93–94). Defendants seek dismissal of Plaintiff's prima facie tort claim on the ground that it is "a catchall for other causes of action that fail" and is impermissibly "premised on the same allegations upon which Plaintiff's other causes of action rely." (Dkt. No. 7-3, at 26).

The elements of prima facie tort are: "(1) intentional infliction of harm; (2) resulting in special damages; (3) without excuse or justification; (4) by an act that would otherwise be lawful." *Twin Labs., Inc. v. Weider Health & Fitness*, 900 F.2d 566, 571 (2d Cir. 1990) (citing *Burns Jackson Miller Summit & Spitzer v. Lindner*, 59 N.Y.2d 314, 332 (N.Y. 1983)). The Second Circuit has held that "[t]he touchstone" of prima facie tort "is 'disinterested malevolence,' meaning that the plaintiff cannot recover unless the defendant's conduct was not only harmful, but done with the sole intent to harm." *Twin Labs., Inc.*, 900 F.2d at 571 (quoting *Burns*, 59 N.Y.2d at 333). "[M]otives other than disinterested malevolence, 'such as profit, self-interest, or business advantage' will defeat a prima facie tort claim." *Id.* (quoting *Marcella v.*

*ARP Films, Inc.*, 778 F.2d 112, 119 (2d Cir. 1985)). "In addition 'special damages must be alleged with sufficient particularity to identify actual losses and round sums without any attempt at itemization are insufficient.'" *Fordham v. Islip Union Free Sch. Dist.*, 662 F. Supp. 2d 261, 277 (E.D.N.Y. 2009) (quoting *Discover Grp. v. Lexmark Int'l, Inc.*, 333 F. Supp. 2d 78, 87 (E.D.N.Y. 2004)).

"[P]rima facie tort was designed to provide a remedy for intentional and malicious actions that cause harm and for which no traditional tort provides a remedy, and not to provide a catch all alternative for every cause of action which cannot stand on its legs." *Gallagher v. New York City Health & Hosps. Corp.*, No. 16-cv-4389, 2017 WL 4326042, at *6, 2017 U.S. Dist. LEXIS 155259, at *22 (S.D.N.Y. Sept. 20, 2017) (quoting *Kickertz v. New York Univ.*, 110 A.D.3d 268, 277 (N.Y. App. Div. 2013)), *aff'd*, 733 F. App'x 3 (2d Cir. 2018). Plaintiff fails to identify any intentional or malicious actions for which "no traditional tort provides a remedy." Indeed, the allegations in the Proposed Amended Complaint in connection with the prima facie tort claim are wholly conclusory. (Dkt. No. 12-2, at ¶¶ 93–94). Accordingly, Defendants' motion to dismiss Plaintiff's prima facie tort claim is granted. *See Gallagher*, 2017 WL 4326042, at *6, 2017 U.S. Dist. LEXIS 155259, at *22 (granting motion to dismiss prima facie tort claim where the "Plaintiffs fail to allege any intentional or malicious action not remedied by Plaintiffs' other tort claims").

### J.   Negligence

In the Proposed Amended Complaint, Plaintiff alleges that Defendants (1) "have acted with gross and/or ordinary negligence and reckless disregard to Plaintiff's rights to fair, timely and equal consideration of her application for benefits under 207-c"; (2) "failed to notify Plaintiff of their '207-c policy,' including its appeal provisions and time limits"; and (3) failed to make the 207-c policy "available to officers until on or about December 2020 when it was uploaded to the database that contains all the Department's rules, regulations, and policies." (Dkt. No. 12-2, ¶

99). The Court of Appeals of New York has recognized that "section 207–c provides no definitive procedure that must be followed, and that such procedures may be the subject of collective bargaining." *Park v. Kapica*, 864 N.E.2d 1284, 1287 (N.Y. 2007) (citing *City of Watertown v. State of N.Y. Pub. Emp. Rels. Bd.*, 733 N.E.2d 171, 178 (N.Y. 2000) ("[T]he grievance procedures for resolving section 207–c disputes must be determined—just as any other grievance procedures are determined—through the collective bargaining process")). Even assuming Plaintiff may pursue such a claim outside an Article 78 proceeding—an issue Plaintiff has not addressed—the Proposed Amended Complaint alleges no facts concerning the relevant procedures as outlined in the CBA or otherwise. *See, e.g.*, *Courtenay v. Graziano*, 173 A.D.3d 1016, 1018–19 (N.Y. App. Div. 2019) (affirming denial of police officer's Article 78 petition appealing denial of § 207-c disability benefits, finding, after reviewing the procedures outlined in governing CBA, that there was no "violation of lawful procedure" or error of law and that denial of benefits was "not arbitrary or capricious or an abuse of discretion"). Accordingly, the Court concludes that the Proposed Amended Complaint fails to state a plausible negligence claim and Defendants' motion to dismiss is granted.

### K.      Further Amendment of the Complaint

The Court grants Plaintiff's cross-motion to amend the Complaint, in part, in accordance with the above discussion. Plaintiff further requests that in the event the Court "deem[s] Plaintiff's PAC insufficient for some lack of specificity," the Court grant Plaintiff "the opportunity to further amend to cure such deficiency." (Dkt. No. 12-3, at 28). Plaintiff's request is denied as to her First Amendment retaliation claims based on her emails, which the Court has determined as a matter of law do not constitute protected speech, *see Montero*, 890 F.3d at 399 (explaining that the question of whether speech is protected is a question of law), but otherwise grants Plaintiff's request. If Plaintiff seeks to amend the Proposed Amended Complaint, Plaintiff

must first file a letter brief along with a proposed second amended complaint detailing how the proposed pleading cures the deficiencies the Court has identified.

## V.     CONCLUSION

For these reasons, it is hereby

**ORDERED** that Defendants' motion to dismiss (Dkt. No. 7) is **GRANTED** as to the following claims, and the following claims are **DISMISSED**:  Plaintiff's state law race discrimination claims; First Amendment retaliation claim; Fourteenth Amendment and § 1981 race discrimination claims against Defendants Shoff, McGork, Cecile, and Trudell; the NYSHRL disability discrimination claim against Defendants McGork, Cecile, and Trudell in connection with the August and October 2020 promotion decisions; the Fourteenth Amendment and NYSHRL gender and disability discrimination claims against Defendants Shoff, McGork, Cecile, and Trudell in connection with the February and June 2021 promotion decisions; any gender- or disability-based retaliation claim in connection with the August and October 2020 promotion decisions, the prima facie tort claim; and negligence claim; and it is further

**ORDERED** that Defendants' motion to dismiss (Dkt. No. 7) is otherwise **DENIED**; and it is further

**ORDERED** that Plaintiff's cross-motion to amend (Dkt. No. 12) is **DENIED** as futile with respect to the above-identified claims that the Court has ordered **DISMISSED**, but is otherwise **GRANTED**; and it is further

**ORDERED** that Plaintiff is directed to file the Amended Complaint, in conformity with the discussion above, by March 2, 2022; and it is further

**ORDERED** that if Plaintiff seeks to file a second amended complaint, Plaintiff must first file a letter brief along with a proposed second amended complaint by March 9, 2022, detailing how the proposed pleading cures the deficiencies the Court has identified. Defendants may file a

response by March 23, 2022. The Court will hold a conference to discuss the proposed pleading, if necessary.

**IT IS SO ORDERED.**

**Dated:** February 24, 2022
Syracuse, New York

Brenda K. Sannes
U.S. District Judge