**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

ALISON BEAUCHINE,

                               Plaintiff,                5:21-cv-00845 (BKS/TWD)

v.

CITY OF SYRACUSE, NEW YORK; POLICE CHIEF
KENTON BUCKNER; DEPUTY CHIEF RICHARD
SHOFF; DEPUTY CHIEF DEREK McGORK; DEPUTY
CHIEF JOSEPH CECILE; DEPUTY CHIEF RICHARD
TRUDELL; and JOHN DOE(S) and/or JANE DOE(S), in
their individual and official capacities as officials, officers,
agents, employees, and/or representatives of the CITY OF
SYRACUSE and/or the SYRACUSE POLICE
DEPARTMENT,

                               Defendants.

**Appearances:**

*For Plaintiff:*
A.J. Bosman
Robert Strum
Bosman Law, L.L.C.
3000 McConnellsville Road
Blossvale, New York 13308

*For Defendants:*
Nicholas Jacobson
Kristen E. Smith
Bond, Schoeneck & King, PLLC
350 Linden Oaks, Third Floor
Rochester, New York 14625

**Hon. Brenda K. Sannes, Chief United States District Judge:**

**MEMORANDUM-DECISION AND ORDER**

## I.  INTRODUCTION

Plaintiff Alison Beauchine, a white female police officer for the City of Syracuse Police Department ("SPD"), brings this action claiming she was denied promotion as a result of disability, gender, and race discrimination. (*See generally* Dkt. No. 46). Plaintiff names as Defendants: the City of Syracuse, New York, SPD Police Chief Kenton Buckner, Deputy Chief Richard Shoff, Deputy Chief Derek McGork, Deputy Chief Joseph Cecile, Deputy Chief Richard Trudell, and John and Jane Does. (*Id.*). Plaintiff asserts claims for disability discrimination under the Americans with Disabilities Act (the "ADA"), 42 U.S.C. §§ 12101–12213, as amended, section 504 of the Rehabilitation Act of 1973 (the "RHA"), 29 U.S.C. § 701 et. seq., and the New York State Human Rights Law ("NYSHRL"), N.Y. Exec. Law § 290 et. seq.; gender discrimination under Title VII of the Civil Rights Act of 1964 ("Title VII"), as amended, 42 U.S.C. § 2000e et seq., the Fourteenth Amendment, 42 U.S.C. § 1983, and the NYHRL; race discrimination under Title VII, 42 U.S.C. §§ 1981 and 1983, and the NYSHRL; retaliation under the ADA, RHA, Fourteenth Amendment, and the NYSHRL; and tortious interference under New York law. (*Id.*). Presently before the Court is Defendants' motion for summary judgment under Federal Rule of Civil Procedure 56. (Dkt. No. 77). The motion is fully briefed. (Dkt. Nos. 84, 85, 87, 93, 94). For the following reasons, Defendants' motion is granted as to Plaintiff's tortious interference claim but is otherwise denied it its entirety.

## II.   FACTS[1]

### A.   Employment by SPD and Assignment to Patrol Unit

Plaintiff has been employed by the SPD as a police officer since 2006. (Dkt. No. 77-2, ¶ 1; Dkt. No. 85-6, ¶ 1). From 2007 through 2018, Plaintiff was assigned to the Patrol Unit, which was in the SPD's "Uniform Division." (Dkt. No. 77-2, ¶ 7; Dkt. No. 85-6, ¶ 7; Dkt. No. 77-13, ¶ 5)).[2] "The function of the Uniform Division is to respond to calls for service dispatched from 911 or to proactively police violations of the law that they observe while patrolling the streets of the City." (Dkt. No. 77-13, ¶ 5). The parties also refer to this as being "on the road." (*Id.*).

### B.   PTSD Diagnosis, Leave, and Application for § 207-c Benefits

"Plaintiff has 'always had anxiety issues'" and "[h]er first panic attack occurred prior to 2006 during the [SPD's] hiring process."[3] (Dkt. No. 77-2, ¶¶ 11–12; Dkt. No. 85-6, ¶ 11–12). "Plaintiff experienced 'frequent' panic attacks during the Police Academy, and was diagnosed with 'a generalized anxiety disorder or something along those lines.'" (Dkt. No. 77-2, ¶ 14; Dkt. No. 85-6, ¶ 14 (quoting Dkt. No. 77-5, at 7–8)). "The panic attacks Plaintiff suffered prior to 2014 were not caused by her work as a police officer." (Dkt. No. 77-2, ¶ 15; Dkt. No. 85-6, ¶ 15).

Plaintiff testified that while her issues with anxiety pre-dated her hiring by the SPD and continued throughout her employment as a police officer, the severity of her symptoms increased

---

[1] The facts are drawn from Defendants' Statement of Undisputed Material Facts, (Dkt. No. 77-2), and Plaintiff's Response to Defendant's Statement of Material Facts, (Dkt. No. 85-6), to the extent the facts are well-supported by pinpoint citations to the record, as well as the exhibits attached thereto and cited therein. The facts are construed in the light most favorable to Plaintiff as the non-moving party. *Gilles v. Repicky*, 511 F.3d 239, 243 (2d Cir. 2007).

[2] Plaintiff "also served in the Human Resources Division and warrant squad," and in 2014 was certified as a "Field Training Officer (FTO)." (Dkt. No. 85, ¶ 5).

[3] Plaintiff "also suffered another panic attack in 2006 while working for Home Depot, and may already have been prescribed Paxil at that time." (Dkt. No. 77-2, ¶ 13; Dkt. No. 85-6, ¶ 13).

in 2015. (Dkt. No. 84-1, at 45–46). "Beginning in the fall of 2015, Plaintiff had panic attacks 'daily, sometimes multiple times a shift.'" (Dkt. No. 77-2, ¶ 22; Dkt. No. 85-6, ¶ 22 (quoting Dkt. No. 77-5, at 10)). These panic attacks were "debilitating," "rendered her unable to 'even function as a human being,'" and "'[o]bviously' interfered with Plaintiff's ability to work," (Dkt. No. 77-2, ¶¶ 21, 23; Dkt. No. 85-6, ¶ 22, 23 (quoting Dkt. No. 77-5, at 10)). "Plaintiff's patrol supervisor witnessed her experience a panic attack 'likely, more than three times,' and these attacks caused physical symptoms that made her 'not really able to function in a patrol officer capacity.'" (Dkt. No. 77-2, ¶ 23; Dkt. No. 85-6, ¶ 23 (quoting Dkt. No. 77-4, at 6–7)).

In or about December 2015, Plaintiff began treatment with Dr. Jason Stepkovitch, a psychiatrist. (Dkt. No. 84-1, at 22; Dkt. No. 84-2, at 37). Plaintiff discussed her experiences as a police officer, including responding to a call on August 6, 2015, where she watched a two-year old, who had been harmed by his babysitter, die; watching people violently commit suicide; and seeing "people having CPR done . . . that had been stabbed in the neck and blood flying out of their neck." (Dkt. No. 84-1, at 44, 54). Dr. Stepkovitch diagnosed post-traumatic stress disorder ("PTSD"). (*Id.* at 68–69).

On or about February 5, 2016, Plaintiff's medical provider, "took [Plaintiff] out of work." (*Id.* at 64, 68). In a letter dated March 16, 2016, Dr. Stepkovitch stated that Plaintiff was "currently undergoing treatment for [PTSD] related to a traumatic event experienced while performing her duties as a parole officer" and "may return to work beginning 3/21/16, light duty with restrictions only." (Dkt. No. 84-19, at 2). Plaintiff stated that Dr. Stepkovitch's letter "was given to Human Resources" at SPD, and she requested placement in a light duty position that was not "on the road." (Dkt. No. 84-1, at 70). When Plaintiff spoke with the Sergeant who was

the "head of the medical unit" in the Human Resources Division,[4] about a light duty position, he initially said that "there wasn't light duty," but then, after speaking with Deputy Chief Cecile, told Plaintiff that she could "be off the road for one month" but then they would put her "back on the road." (*Id.* at 71, 82; Dkt. No. 84-4, at 31). Plaintiff consulted with her union president, Jeffrey Piedmonte, who said "no" and that "you can't put a time on it." (Dkt. No. 84-1, at 71). Because the SPD "wouldn't let [Plaintiff] come back light duty unless it was for that one month time frame," Plaintiff "ended up just staying out" and continued counseling. (*Id.*).

Plaintiff testified that on or about March 17, 2016, her supervisor, Sergeant Eric Lindgren, filed, on her behalf, an application for benefits under New York General Municipal Law § 207-c ("§ 207-c Application"), which provides benefits to police officers injured on duty. (Dkt. No. 84-1, at 67–68; Dkt. No. 84-18). The § 207-c Application listed Plaintiff's date of injury as August 6, 2015, described the "Accident/Injury" as "Traumatic incidents causing [PTSD]," the "Injury Sustained" as "Mental illness," and described the "Medical Assistance" received as "Professional counseling and medical treatment with antidepressant medication." (Dkt. No. 84-18, at 3). Sergeant Lindgren described "the circumstances surrounding this injury" as follows:

> On 6 August 2015 . . . Officer A. Beauchine responded . . . in regards [sic] to a two-year old who had been . . . struck by the adult babysitter and fell down a flight of stairs . . . . Officer Beauchine participated in the investigation and witnessed the aftermath, having close contact with the injured child. This incident, along with several others of similar traumamatic [sic] content, triggered a severe psychological/mental reposnse [sic] in Officer Beauchine. This and incidents like it, subsequently caused Officer Beauchine to suffer from debilitating panic attacks both while on duty and at home.

---

[4] The record indicates this was "Sergeant Mourey" but is unclear as to this Sergeant's first name. (*See, e.g.*, Dkt. No. 84-45, at 10 (referring to "Mark Mourey"); Dkt. No. 84-9, at 18 (referring to "Mike Mourey"). The Sergeant's first name is immaterial.

(*Id.* at 4).

### C.      Return to Work and "Second" § 207-c Application

When, in August 2016, Plaintiff sought to return to work, SPD sent her for a fitness-for-duty examination by William M. Cross, PhD LMFT.[5] (Dkt. No. 84-12, at 2; Dkt. No. 84-2, at 95). In a letter dated August 27, 2016, Dr. Cross stated that he conducted a clinical interview and "the Post Traumatic Stress Syndrome Inventory" and that "the results of the evaluation were that P.O. Beauchine's symptoms have significantly improved." (Dkt. No. 77-26, at 2). Dr. Cross further stated that "Officer Beauchine has responsibly attended therapy, has sought and followed professional advice in healing, has developed skills to reduce the symptoms of PTSD and is highly motivated to return to duty" and that in his "professional opinion," Plaintiff was "fit to return to duty." (*Id.*). In September 2016, Plaintiff returned to Patrol, where she worked "the front desk" as she was pregnant. (Dkt. No. 84-2, at 35; Dkt. No. 84-22, at 2).

In an affirmation, Deputy Chief Cecile states that in or around September 2016, he "became aware that Plaintiff was asking about a pending application for benefits under" § 207-c "related to the medical leave she had just completed." (Dkt. No. 77-24, ¶ 8). Deputy Chief Cecile further states that he "had not seen a § 207-c application at this time."[6] (*Id.*). On September 6, 2016, after being told (by either Sergeant Sue Izzo or Piedmonte) to file another application when she returned to work, Plaintiff submitted a § 207-c Application for benefits "for panic attacks and PTSD."[7] (Dkt. No. 84-1, at 92; Dkt. No. 77-2, ¶ 8; Dkt. No. 85-6, ¶ 8). "In her

---

[5] Plaintiff states that "Dr. Cross was, and still is, employed by the [SPD] to provide peer support for police officers and sworn personnel." (Dkt. No. 85, ¶ 8).

[6] Deputy Chief Cecile states that he "believe[s] the version of the" March 2016 § 207-c Application "was never completely processed in the Department's computer system." (Dkt. No. 77-24, ¶ 10).

[7] As her prior § 207-c Application had not been addressed, and there had been no determination that her PTSD symptoms were an "on-duty injury," Plaintiff had been required to use sick bank time to cover her leave. (Dkt. No. 77-2, ¶ 20; Dkt. No. 85-6, ¶ 20).

application for 207-c benefits, Plaintiff stated that her PTSD was sustained as a result of the performance of her duties as a police officer."[8] (Dkt. No. 77-2, ¶ 10; Dkt. No. 85-6, ¶ 10). Plaintiff supplemented her application with letters from Dr. Stepkovitch and a second letter from Dr. Cross. (Dkt. No. 84-19, at 2; Dkt. No. 84-21, at 3–4).

On or about November 17, 2016, the SPD contacted psychiatrist Steven Fayer, M.D., "requesting an independent medical exam of Officer Beauchine" in connection with her § 207-c Application. (Dkt. No. 84-23, at 2). According to Deputy Chief Cecile, "[d]ue to the difficulty of determining whether Plaintiff's symptoms were caused by her police duties, or by some other events in her life," he and then-Chief Frank Fowler "decided to send Plaintiff to an independent medical exam with a psychiatrist who could evaluate the cause of her symptoms." (Dkt. No. 77-24, ¶ 11). Deputy Chief Cecile states that the SPD "selected" Dr. Fayer "because he possessed specialized expertise conducting independent psychiatric examinations for PTSD and related disorders, and we were unable to find a local doctor with such expertise." (*Id.* ¶ 12).

Plaintiff testified that Sergeant Izzo notified her that the SPD was "requesting that [Plaintiff] go see this doctor in New York City"—referring to Dr. Fayer—who was "supposed to know everything about PTSD." (Dkt. No. 84-2, at 99–100). According to Plaintiff, as she had already provided the SPD with "the findings of Dr. Stepkovitch and Dr. Cross that [she] suffered an on-duty injury,"[9] (Dkt. No. 85, ¶ 8), she contacted Piedmonte and asked why she was "going to see another doctor?" (Dkt. No. 84-2, at 99). In his affirmation, Piedmonte states that in or

---

[8] The only difference between the September 2016 and March 2016 § 207-c Applications is the date. (Dkt. No. 84-18; Dkt. No. 77-28).

[9] The letters in the record by Drs. Stepkovitch and Cross discuss Plaintiff's PTSD but do not discuss whether it was an on-duty injury. (Dkt. No. 84-19; Dkt. No. 84-27). Plaintiff testified that when she asked Dr. Cross in August 2016 whether, in his opinion, her PTSD was an on-duty injury, "[h]is answer was, 'Of course.'" (Dkt. No. 84-2, at 95–96).

about December 2016, then-Chief Fowler "stated that he was reluctant to allow 207-c benefits for PTSD in particular because that would 'open the floodgates.'" (Dkt. No. 85-1, ¶ 4).

Plaintiff saw Dr. Fayer for examination on December 14, 2016. (Dkt. No. 77-24, ¶ 14). Plaintiff avers that Dr. Fayer "was profoundly unengaged" during her examination "and, at one point, stopped to feed pigeons outside his window," and, at another point, asked Plaintiff to "leave his office in the middle of the examination, stating that he 'needed to make a phone call,'" and left Plaintiff "in his waiting room for over 45 minutes before continuing the appointment." (Dkt. No. 85, ¶ 8).

Dr. Fayer issued a report to the SPD dated December 19, 2016. (Dkt. No. 77-24, ¶ 14). According to Defendants, "[a]fter examining Plaintiff, Dr. Fayer determined that Plaintiff's mental health symptoms were 'not a result of her work as a police officer' and 'would have developed no matter what' due to the 'trauma she was exposed to as a child.'" (Dkt. No. 77-2, ¶ 17). Sergeant Izzo provided Plaintiff with a copy of the report, and Plaintiff cried in Sergeant's Izzo's office when she read it. (Dkt. No. 84-2, at 101–02). Plaintiff testified that after she told Sergeant Izzo that the report was "unbelievable" and that she "wasn't trying to take advantage of anything" but had been trying to "fix" herself and get "back to work," Sergeant Izzo "said, 'Alison, I think you should get an attorney.'" (*Id.* at 102).

Plaintiff subsequently met with Chief Fowler, Deputy Chief Cecile, and Piedmonte, and provided "a highlighted copy of [Dr. Fayer's] report with handwritten notes identifying errors and false statements." (Dkt. No. 85, ¶ 9). Plaintiff had also provided a letter from Dr. Stepkovitch stating that he "respectfully disagree[d]" with Dr. Fayer's opinion and conclusion that Plaintiff's PTSD was not work-related. (Dkt. No. 84-2, at 110). Plaintiff "pledged [her] case to them" at the meeting and Piedmonte supported her, telling Chief Fowler and Deputy Chief Cecile that both

Plaintiff's own doctor and Dr. Cross had determined her PTSD was work-related and that it was only the "goofy doctor in New York City" who "denies it." (*Id.* at 116). Plaintiff testified that after the meeting, Piedmonte told her that Deputy Chief Cecile "wanted [Plaintiff] to go see another doctor" but that Piedmonte had said no, noting that Plaintiff was "nine months pregnant" and would be "going out any day now." (*Id.* at 117).

Plaintiff's daughter was born in April 2017, and Plaintiff was on maternity leave until July 2017. (Dkt. No. 84-12, at 14, 116). During that time period, Plaintiff was unable to use FMLA to take time off because she had been on leave too many hours "the year prior." (Dkt. No. 84-2, at 117). When Plaintiff returned in July 2017, she was again assigned to work Patrol. (*Id.* at 133–34). Plaintiff testified that this was the first time since February 2016 that she had been on the road. (Dkt. No. 84-1, at 108).

Although Plaintiff had asked Piedmonte, and others at SPD, about the status of her § 207-c Application, the response "was always" that it was "undecided." (Dkt. No. 84-2, at 122). Plaintiff testified that she did not recall whether she asked about the status of her § 207-c Application when she returned from maternity leave in July 2017 and explained that "it was just very clear to [her] that they were trying not to do anything with it, and sweep it under the rug, and hope it goes away." (*Id.* at 119).

D.    **Additional Traumatic Incidents**

Plaintiff presented evidence of three additional traumatic events she experienced during the relevant time period. First, in October 2016, Plaintiff's younger sister was killed in a car accident. (Dkt. No. 84-2, at 139). Second, in April or May 2017, Plaintiff's seven-week-old daughter stopped breathing and was admitted to the intensive care unit for eight days. (*Id.* at 14, 117). Third, "[o]n or about November 7, 2017, while working Patrol, a suspect driving a tow

9

truck rammed [Plaintiff's] vehicle in the course of a vehicle pursuit."[10] (Dkt. No. 77-2, ¶ 25; Dkt. No. 85-6, ¶ 25).

### E.      Transfer from Patrol to the Records Division

On or about April 2, 2018, Plaintiff transferred from Patrol to the "Administration Bureau, Central Records Division" ("Records"). (Dkt. No. 84-2, at 143). Plaintiff testified that Deputy Chief Lynette DelFavero had offered Plaintiff the position in Records because Deputy Chief DelFavero knew that Plaintiff "was extremely depressed." (*Id.* at 143–44). Plaintiff testified that Deputy DelFavero also knew that Plaintiff had "lost [her] sister not too long ago" and was also aware of the tow truck incident. (*Id.* at 146). Plaintiff testified that she was not having "panic attacks or any of that" at the time she transferred and that, at that point, she only suffered from depression. (*Id.* at 144).

Plaintiff stated that in Records she serves as "the department's FOIL officer" and handles "all the FOIL requests that come in." (Dkt. No. 84-1, at 14). Plaintiff also completes "all the background checks for other law enforcement agencies," and works with corporation counsel. (*Id.*). Plaintiff testified she has supervisory responsibilities in Records, in the form of supervising an assistant that helps her "complete things in [her] section." (*Id.* at 142).

While serving in Records, Plaintiff continued to work "overtime on the road." (Dkt. No. 85, ¶ 11). Plaintiff states that in 2018 and 2019, she worked "more than six summer deployment

---

[10] "Plaintiff submitted an application for 207-c benefits for injuries resulting from that accident and her application was granted." (Dkt. No. 77-2, ¶ 26; Dkt. No. 85-6, ¶ 26).

shifts on road patrol without any difficulty"[11] and that she "worked in 2021 through 2023 on overtime road patrol assignments."[12] (*Id.*).

### F.    Meeting with Chief of Police Buckner

In November 2018, Kenton Buckner took the position of Chief of Police of the SPD. (Dkt. No. 77-13, ¶ 1). In his affirmation, Buckner states that one of his "early goals as Chief was to reduce the number of sworn personnel performing office-based, non-policing functions so that the [SPD] could assign a greater number of sworn officers to the Uniform Division, which [he] believe[d] was understaffed." (*Id.* ¶ 4). Chief Buckner states that he engaged in a process "referred to as 'civilianization,'" in which he "performed a top to bottom assessment of the Department and began working with [his] Deputy Chiefs and the Union representing the officers to transition office positions that were held by sworn officers to civilian roles in order to free up officers for Patrol." (*Id.* ¶ 6). Chief Buckner avers that "positions in Human Resources, Accounting and Information Technology were filled by civilians to put more officers on the road." (*Id.*).

Plaintiff testified that in or about December 2018, she was "called up to the chief's office" to explain the "delegation of authority paperwork" to Chief Buckner. (Dkt. No. 84-2, at 160–61). Plaintiff stated that she went to Chief Buckner's office and while she was explaining that the delegation of authority "allowed [him] to . . . have [Plaintiff] complete . . . requests on [his] behalf for the police department," Chief Buckner asked: "Now, why do we have police officers doing administrative work?" (*Id.* at 162). Plaintiff testified that when she responded by

---

[11] According to Deputy Chief Shoff, "[s]ummer deployment was a staffing strategy that required officers who typically do not work patrol to take on a minimum number of overtime patrol shifts on the summer weekends to manage the call load and ensure officer safety," explaining that this was necessary due to a greater demand for police services in the summer and fewer available officers due to summer vacations. (Dkt. No. 77-35, ¶ 24).

[12] Plaintiff did not work any summer deployment shifts in 2020 due to COVID-19 protocols and reduction in call load. (*Id.* ¶ 26).

explaining what she did "within the police department," Chief Buckner said: "Yeah, but we have civilians that can do that." (*Id.*). Plaintiff stated that she told Chief Buckner she did "the FOILS for the police department," completed subpoenas, completed "any background checks that come in for other agencies," and sealed cases, but that Chief Buckner "kept pushing and insisting" as to why she was performing administrative work. (*Id.* at 162–63; Dkt. No. 84-1, at 156). Plaintiff testified that she "could feel [herself] start to get upset" and asked if she could close the door. (Dkt. No. 84-1, at 156). After closing the door, Plaintiff "told him [her] story of" "how [she] left the road" and "why [she] ended up in" Records. (*Id.* at 164–65). Plaintiff stated that she "explained . . . having the PTSD, never getting an answer from the police department at that time" with respect to her § 207-c Application. (*Id.* at 164). Plaintiff "described the mental health symptoms and panic attacks that she had experienced while on Patrol." (Dkt. No. 77-2, ¶ 31; Dkt. No. 85-6, ¶ 31). Plaintiff testified that she told Chief Buckner about her "sister dying" less than a year ago, that she had "been hit by a tow truck," about her daughter, and that she "just was going through a very difficult time." (Dkt. No. 84-2, at 164–65). Plaintiff stated that twice during their conversation, Chief Buckner asked whether she was "okay now?" and that she said "Yes" both times. (*Id.* at 165). Plaintiff stated that she was crying and that Chief Buckner gave her "a hug at the end of it and said, 'My God. You've been through it.'" (*Id.*). Plaintiff testified that Chief Buckner told her that he would talk to Deputy Cecile about the § 207-c Application. (*Id.* at 164).

  Chief Buckner recalled a slightly different version of his December 2018 meeting with Plaintiff. He stated that during their conversation, Plaintiff indicated that she had heard that he was attempting to place civilians in the administrative positions and "expressed concerns that she had about going back to the streets and . . . told . . . her story about some of the things she had

been through in her personal and professional life, and she had grave concerns about that." (Dkt. No. 77-8, at 2). Chief Buckner stated that Plaintiff told him it "was near the time of the anniversary of her sister's death and that caused her to have some panic attacks and anxiety issues, very severe." (*Id.* at 4). Chief Buckner testified that it was his understanding from their conversation that even before her sister's death, Plaintiff "had suffered those types of panic attacks or anxieties" and had "a history of . . . dealing with those types of issues." (*Id.*). Chief Buckner stated that Plaintiff indicated that "after being taken off the street and being put in the records department," she was "still managing her condition and that she had concerns about going back to the street" but acknowledged that Plaintiff also said "on more than one occasion" that "if she had to go back to the streets she would give a try." (*Id.*). Chief Buckner testified that Plaintiff

> was very emotional during that meeting and a sobbing kind of cry, a very deep cry, and she left an impression on me. And I can tell you that every part of me believed her. There was nothing in me that felt like that she was faking. There was nothing in me that thought that she was doing this to try to get out of work because one of the things that had been told to me prior to meeting with her once I knew she wanted to meet was that she was a very good employee.

(*Id.* at 5). Following their meeting, Chief Buckner had "an appreciation for the fact that considering what she goes through she still comes to work every day" but "shared her concern about her going back to the street" and thought that it "was clear . . . that she had some struggles with something." (*Id.*). Plaintiff, however, testified during her deposition that she "never once said to [Chief Buckner] that [she] was scared [or did not want] to go back to the road." (Dkt. No. 84-2, at 164).

### G.    Application for Promotion to Sergeant

"In 2019, Plaintiff took the Civil Service examination required to become eligible for promotion to Sergeant." (Dkt. No. 77-2, ¶ 32; Dkt. No. 85-6, ¶ 32). "Plaintiff scored an 83 . . .

which was ninth highest out of the candidates for Sergeant." (Dkt. No. 77-2, ¶ 33; Dkt. No. 85-6, ¶ 33; Dkt. No. 77-15, at 2). "Although the Deputy Chiefs participate in the interview process for promotional candidates, the Department's Chief of Police maintains final authority over promotional decisions." (Dkt. No. 77-2, ¶ 35; Dkt. No. 85-6, ¶ 35).

### 1.     First Promotion Cycle

According to Deputy Chief Cecile, "[t]hroughout 2020, [the SPD] had multiple openings for Sergeants to work on patrol due to a larger than usual number of retirements and resignations" and therefore "needed to promote multiple Police Officers." (Dkt. No. 77-24, ¶ 29). In June 2020, Chief Buckner and Deputy Chiefs Richard Shoff, Richard Trudell, Derek McGork, and Joseph Cecile interviewed Plaintiff as a candidate for promotion to sergeant. (Dkt. No. 77-2, ¶ 36; Dkt. No. 85-6, ¶ 36; Dkt. No. 77-24, ¶¶ 31–32). Plaintiff testified that during the interview, she said "that if anybody has any questions with me going back to the road," she was "okay with it," that she had PTSD but "got help for it," and that she did not want "it to be held against" her. (Dkt. No. 84-2, at 173–74). Neither Chief Buckner nor any of the Deputy Chiefs "said anything" about Plaintiff's mental health. (*Id.* at 175). Plaintiff stated that during the interview, she communicated her interest in returning to road patrol to do "a couple of shifts" as bail reform and juvenile laws had all changed and stated that if she "was going to be a supervisor," she "should be familiar" with those changes. (*Id.* at 174).

Chief Buckner testified that after her interview, he and the Deputy Chiefs "were unanimous in [their] decision not to promote" Plaintiff. (Dkt. No. 84-3, at 145). Chief Buckner explained that "one of the reasons" he was concerned about promoting Plaintiff to sergeant was her PTSD diagnosis. (*Id.* at 142). He stated that his concern was that there would be "something going on that would cause her to begin to have an episode" or that Plaintiff could "be involved in a critical incident that would cause her to shut down or to not be able to have good situational

awareness and put herself or other individuals in danger." (*Id.* at 143). Chief Buckner testified at

his deposition that he did not recall Plaintiff referring to her PTSD during her June 2020

interview but that he did discuss Plaintiff's PTSD with the Deputy Chiefs after her interview. (*Id.*

at 144–45). Chief Buckner testified that the decision not to promote Plaintiff was "based upon

the fact that information she had shared with me and after hearing her testimony about that I

shared her concern and I was uncomfortable with promoting her back to the road absent being

able to show that she could work under those conditions in an operational capacity." (*Id.* at 41–

42). He further stated that:

> Ms. Beauchine had a good work record for the position that she was
> doing, but for the position that she would be going back to she had
> had issues and struggles and was removed from that position. And I
> believe based upon what had [] happened with her historically and
> what she shared with me during my tenure that I shared her concern
> about her going back to patrol.

(*Id.* at 46). Chief Buckner stated that he did not believe Plaintiff's "issues and struggles" were

"permanent," which is why he "told her that [they] created a path for her to" to return to patrol.

(*Id.* at 47).

On or about August 11, 2020, Plaintiff's supervisor, Sergeant Mark Werbeck, forwarded

to Deputy Chief Shoff Plaintiff's email requesting "to work one day per week in patrol while

maintaining her position in the Records Division." (Dkt. No. 77-35, ¶ 10; Dkt. No. 77-36, at 2).

Plaintiff testified that given a recent drastic change in a number of laws, she thought she should

"be familiar with how those changes were affecting patrol" and asked to be assigned to patrol

one day per week or "'[e]ven just a couple of times,' just to be familiar." (Dkt. No. 84-2, at 174).

On or about August 27, 2020, Deputy Chief Shoff informed Plaintiff that her request to return

one day per week was denied and that she could return to Patrol full-time or she could work overtime.[13] (*Id.* at 158).

Chief Buckner states that "[a]fter it was decided to skip Plaintiff and not promote her following her June 2020 interview, [he] directed Deputy Chief Shoff to explain to Plaintiff that she would be considered again if she obtained more current experience working in Patrol to demonstrate her ability to supervise officers in a patrol capacity." (Dkt. No. 77-13, ¶ 28). Deputy Chief Shoff avers that Chief Buckner had "made clear to [him] that Plaintiff needed to display a more recent body of work as a patrol officer." (Dkt. No. 77-35, ¶ 21). On September 1, 2020, Deputy Chief Shoff met with Plaintiff "to inform her that she was not being promoted." (Dkt. No. 77-35, ¶ 17; Dkt. No. 77-38, at 2). Deputy Chief Shoff also "talked about getting experience in the Patrol Division so that she could stay up on the current trends and responsibilities." (Dkt. No. 77-39, at 2). Deputy Chief Shoff noted that he had recently denied Plaintiff's request to return to Patrol one day per week, but reiterated that "if she wants to transfer back to patrol," he would help her "go back." (*Id.*). He also told Plaintiff "that she was free to sign up for overtime shifts on patrol to get more experience." (Dkt. No. 77-35, ¶ 22). Deputy Chief Shoff recounted

---

[13] In an August 27, 2020 email to Plaintiff, Deputy Chief Shoff wrote:

> Ofc. Beauchine, after careful consideration of your request to work patrol one day a week instead of your normal assignment in records I have decided to deny that request. Having thought about all of the new requirements that PD is having under 50a, Criminal Justice Reform, as well as all of the new staff in records in general, now is not a good time. I also had to consider the fact that the records division is currently leading the pack in my Bureau for needing to use OT to backfill for minimum staffing. With the recently announced contingency budget by city hall I am under a directive to further curtail my allotted OT. If you want to go back to Patrol you are welcome to put in a transfer request and I'll see what I can do to get somebody else trained to do your job freeing you up to do so. I do appreciate the good work you do down there. I hear nothing but positive about your work ethic and work product.

(Dkt. No. 84-16, at 2).

that Plaintiff "tried to make her case for readiness for the position by pointing to her time working on patrol during 'summer deployment.'" (Dkt. No. 77-35, ¶ 23).

Plaintiff did not put in a transfer request for Patrol after being told she should do that if she wanted to be promoted because she felt she was being singled out. (Dkt. No. 84-2, at 197). Plaintiff testified that at the time she "had a schedule set up" as she and her husband worked opposite shifts, and she "wasn't willing to mess up [her] whole life at that point for nothing and then still take the chance that" she would not "be promoted anyways," and then be "stuck in patrol." (*Id.* at 198).

On or about September 8, 2020, the SPD "promoted three Police Officers to the rank of Sergeant": P.M., C.R., and B.L.[14] (Dkt. No. 77-2, ¶ 37; Dkt. No. 85-6, ¶ 37). P.M., a white male, was ranked first on the civil service list, having received a score of 99,[15] B.L., a white male, was ranked sixth, having received a score of 86, and C.R., a Black male, was ranked tenth, having received a score of 81.5. (Dkt. No. 77-15, at 2; Dkt. No. 77-2, ¶¶ 40, 45, 48; Dkt. No. 85-6, ¶¶ 40, 45, 48). "Upon promotion, all three were assigned to the Uniform Division supervising Police Officers in a patrol capacity, as nearly all newly promoted Sergeants are." (Dkt. No. 77-2, ¶ 38; Dkt. No. 85-6, ¶ 38). "Patrol Sergeants must provide leadership and manage Police Officers in stressful situations where they are responsible for the safety not only of themselves, but of other officers and citizens." (Dkt. No. 77-2, ¶ 39; Dkt. No. 85-6, ¶ 39).

---

[14] The Court utilizes initials to protect any privacy interests implicated by the disclosure of third-party employment information.

[15] "In earlier rounds of promotions in November 2019 and March 2020, [P.M.] was not selected for promotion and seven lower scoring officers were promoted instead because he was subject to discipline in 2018." (Dkt. No. 77-2, ¶ 41; Dkt. No. 85-6, ¶ 41). "At that time, it was determined that [P.M.] should continue to work without further disciplinary issues to demonstrate that he could be successful as a Sergeant." (Dkt. No. 77-2, ¶ 42; Dkt. No. 85-6, ¶ 42). "At the time of the September 2020 promotion cycle, [P.M.] had continued to work without any further disciplinary issues." (Dkt. No. 77-2, ¶ 42; Dkt. No. 85-6, ¶ 42).

Deputy Chief Shoff avers that he explained to Plaintiff during their September 1, 2020 meeting that they were "skipping her to get to [C.R.]," who had "several years of not only seniority but he has been supervising the crossing guards and City Hall and City Hall Commons CSO's for several years" and had "proven his ability to lead." (Dkt. No. 77-39, at 2). Plaintiff testified that she recalled Deputy Chief Shoff's explanation regarding C.R., but that she "knew exactly what was going on," which was that C.R. "was being promoted because" "he's a Black male." (Dkt. No. 84-2, at 176; Dkt. No. 84-1, at 144).

## 2.    Second Promotional Cycle

Plaintiff was next considered for promotion to sergeant during the September 2020 promotional cycle. (Dkt. No. 77-2, ¶ 54; Dkt. No. 85-6, ¶ 54). "In October 2020, Plaintiff became aware that [D.P., S.B., J.S., M.L.] had been selected for promotion, and that she had not." (Dkt. No. 77-2, ¶ 76; Dkt. No. 85-6, ¶ 76). Plaintiff, with a civil service exam score of 83, was higher on the civil service list than the four officers selected, whose scores were, respectively, 79, 78, 77, and 77. (Dkt. No. 77-13, ¶ 34). Chief Buckner states in his affirmation that: "We did not promote Plaintiff in this November round of promotions for the same reason she was not promoted two months earlier in September. Nothing had changed at this point to alter that decision. She had not made an effort to request a full-time transfer to patrol." (Dkt. No. 77-13, ¶ 35). Chief Buckner further states that he also "skipped Officer [W.C.]" during this promotional cycle even though his score was "81, and so he was ahead of the four officers promoted." (Dkt. No. 77-13, ¶ 36). Chief Buckner explained that he and the Deputy Chiefs were concerned about W.C.'s history of "car crashes" and that "this presented a safety issue, and made him less qualified for promotion to Sergeant." (*Id.*). Chief Buckner's office "instructed [W.C.] that he needed to display an ability to work patrol without additional car crashes." (*Id.*).

Plaintiff and Deputy Chief Shoff met on or about October 15, 2020, "to discuss the decision to skip her a second time." (Dkt. No. 77-35, ¶ 34). Deputy Chief Shoff recalls discussing with Plaintiff "the concerns Buckner had about her ability to be a supervisor in patrol based on the difficulties she had previously experiences as she described to Buckner in their prior conversation." (*Id.* ¶ 35). Plaintiff testified that during that meeting, Deputy Chief Shoff told her that she was not being promoted and when she asked why, he responded: "because of your conversation with the chief"—referring to the conversation Plaintiff had with Chief Buckner in December 2018. (Dkt. No. 84-1, at 154). Plaintiff further stated that Deputy Chief Shoff told her that he had heard through a sergeant that her transfer to Records had been "involuntary." (Dkt. No. 84-2, at 183). Plaintiff responded that she "was not forced to go to Records" and that Deputy Chief DelFavero had "offered" her the position in an effort to help Plaintiff because Plaintiff "was going through a very difficult time." (*Id.*).

On October 15, 2020, Plaintiff sent the following email to Chief Buckner and all the Deputy Chiefs:

> Let me start off by relaying to you all how disgusted I am. Time and time again, this administration as well as previous administrations, have shown that you are incapable of doing the right thing. I would like a written reason as to why I am not being promoted, and skipped yet again. . . .
>
> I am appalled at the fact that I have been skipped for certain individuals in the past, and again right now, that I have first hand knowledge are less qualified than I am. Some of these individuals have made decisions that they could have been arrested for, and yet they are promoted. . . . .
>
> The ONLY person who did do the right thing, Chief Lynette Delfavero offered me this job to try and help me . . . through one of the most difficult times in my life. . . . It is hard to imagine that any of the above reasons are being held against me, and that I am being denied a promotion based on what has happened, but that seems to

be the case. It is sad, and disheartening to say the least. It is cowardly.

(Dkt. No. 77-18, at 2). Plaintiff additionally stated that she believed that she was "screwed over by the department's handling" of her PTSD diagnosis and that she was "never . . . provided with any written outcome as to whether or not this diagnosis was 'on duty.'" (*Id.*). Finally, she stated that that she was "embarrassed for this police department's administration." (*Id.*).

In a December 7, 2020 email to Piedmonte regarding the 207-c claim Plaintiff filed in 2016, Chief Buckner wrote that the SPD had "reviewed [its] files and determined the Department denied the claim." (Dkt. No. 77-20, at 2). "[U]nfortunately," Chief Buckner continued, the SPD did "not have a copy of the denial letter in the file to provide for your records." (*Id.*). Chief Buckner advised that in the event Plaintiff did not receive a denial letter, the 207-c policy permitted her "to compel the Department's determination, within 60 days of the application, via an Article 78 proceeding." (*Id.*).

On December 9, 2020, Plaintiff sent an email to Chief Buckner, the Deputy Chiefs, the SPD's director of human resources, and an attorney in the Office of Corporation Counsel, stating that she was never "provided with any documentation denying [her] 207c claim," that December 8, 2020, was "the first time [she had] been notified that a 'decision' was made," and that she was appealing the decision. (Dkt. No. 77-21, at 2). Plaintiff stated that she "would like copies of the documents used to make the decision to deny [her] claim" as well as "an official denial letter as the 207c policy clearly states the Chief shall render," and asked "[w]ho authored the 207c denial and on what date?" (*Id.*). Plaintiff also asserted that: "This process has been extremely frustrating, absolutely unfair and discriminatory towards" her and that her claim "was not handled as any other 207c claim would be handled, and was treated differently due to the fact that it involved the mental health of an officer." (*Id.*).

That same day, December 9, 2020, Chief Buckner met with Plaintiff "to discuss the October 15, 2020, email, as well as the December 9 email, and advised her that while she was free to voice complaints and concerns, she should do so in a respectful manner and through the chain of command." (Dkt. No. 77-2, ¶ 89). During the meeting, Chief Buckner addressed the "disrespectful tone" of Plaintiff's email and told her that while she had the right to question matters about her 207-c Application and "unfair treatment," when she sent correspondence to him "or anyone else in this organization, watch your tone, you're being disrespectful." (Dkt. No. 77 (digital recording of meeting 0:01:30–0:02:06)). Chief Buckner told Plaintiff that he "also will not tolerate insubordination" and that he was giving her an order to "knock that kind of stuff off." (*Id.* 0:02:06–0:02:15). Chief Buckner also told Plaintiff that if she had questions about the promotion process, he understood that, but that he had not been disrespectful with her and he would not tolerate it. (*Id.* 0:02:27–0:02:38). When Chief Buckner read the excerpt from Plaintiff's October email stating that "time and time again the administration . . . has shown they are incapable of doing the right thing," Plaintiff responded that she was "stating facts" and questioned how Chief Buckner could discern a "tone" from written words. (*Id.* 0:02:40–0:02:58). Chief Buckner read a line from Plaintiff's October email: "you have shown that you will truly promote anyone, anyone but me" and asked Plaintiff: "you are trying to get promoted writing this kind of stuff" to which Plaintiff responded that she stood by everything that she said. (*Id.* 0:03:10–0:03:20). When Chief Buckner warned Plaintiff that if she continued with her conduct she would "be disciplined," Plaintiff asked: "so now I'm being retaliated against for standing up for myself?" (*Id.* 0:03:30–0:03:36). Chief Buckner responded: "call it whatever you want to call it, you are being put on notice" that she would be written up for her "tone and demeanor" and insubordination if she continued making statements in the tone she utilized in her October 2018

email. (*Id.* 0:03:33–0:04:20)). Plaintiff was not disciplined. (Dkt. No. 77-2, ¶ 89; Dkt. No. 85-6, ¶ 89).

### 3.     Third Promotion Cycle

In February 2021, the SPD filled two additional sergeant vacancies, promoting K.A., a white male who scored 79 on the civil service exam and C.L., a Black female who scored 76. (Dkt. No. 77-2, ¶ 90; Dkt. No. 85-6, ¶ 90; Dkt. No. 77-13, ¶ 47). According to Chief Buckner, although "reachable for promotion . . . in November 2020," K.A. had not been selected "because his supervisor did not support him for promotion." (Dkt. No. 77-13, ¶ 48). Deputy Chief Shoff "sorted through the issues that caused concern" and determined that "the concerns of [K.A.'s] supervisor were rooted in a personal conflict and did not render [K.A.] unqualified for promotion." (*Id.*). After Deputy Chief Shoff shared the results of his investigation with Chief Buckner and the other Deputy Chiefs, K.A. "was promoted in February 2021." (*Id.*). Plaintiff testified at her deposition that K.A. was in the "same circumstance" as she was "as far as being gone from the road even longer" than she had been and, in addition, had "no dealings with police work," and yet "he was promoted." (Dkt. No. 84-2, at 208). According to Chief Buckner, Plaintiff was not promoted in February 2021 "because she still had not taken any steps to work patrol, and so [Chief Buckner's] view of her preparedness and qualifications to be a Patrol Supervisor had not changed." (Dkt. No. 77-13, ¶ 52).

### 4.     Fourth Promotion Cycle

In June 2021, the SPD promoted to sergeant C.G., a white male with a civil service score of 84, D.R., a white male with a civil service score of 84, and D.K., a white male with a civil service score of 80. (Dkt. No. 77-2, ¶ 96; Dkt. No. 85-6, ¶ 96; Dkt. No. 77-13, ¶ 49). All three could have been promoted earlier but had declined promotion during the previous cycles. (Dkt. No. 77-13, ¶¶ 50–51). According to Chief Buckner, Plaintiff was not promoted in February 2021

"because she still had not taken any steps to work patrol, and so [Chief Buckner's] view of her preparedness and qualifications to be a Patrol Supervisor had not changed." (*Id.* ¶ 52). Chief Buckner states in his affirmation that although he "was not happy with the insubordinate email [Plaintiff] sent [him] on October 15, 2020, and the subsequent email on December 8, 2020 . . . those emails were not the reason for these subsequent decisions." (*Id.*).

### H.     Consent Decree

The SPD had been under a "Consent Decree" since 1980 "stemming from litigation in the 1970's when the City desired greater diversity in the Department and believed the civil service tests created and administered by New York State and Onondaga County were discriminatory and hindering the Department's ability to recruit and hire women and minority officers." (Dkt. No. 77-13, ¶ 59). "The Consent Decree created and protected a practice where the County would issue a separate list of Black candidates for the position of entry level Police Officer and the City was permitted to apply [a formulation] resulting in Black officers getting hired with a lower score than might otherwise be reachable if there was one list." (*Id.* ¶ 60).

In his affirmation, Chief Buckner states that when he became Chief, he learned about the hiring practice premised on the Consent Decree "and inquired as to whether the same practice was used for promotions." (*Id.* ¶ 61). Chief Buckner states that he "was informed that the County did not issue a separate list for Sergeant or other promotional Civil Service exams, and that the Decree was only used for hiring, and never used for promotions" and that he complied with this practice. (*Id.*). However, during his deposition, Chief Buckner acknowledged that although he did not use the consent decree for promotional purposes, he did "believe it assisted with the spirit of the consent decree." (Dkt. No. 84-3, at 107). Piedmonte states in his affirmation that when Chief Buckner "questioned why there weren't more minorities in upper ranks" Piedmonte

"explained that promotions were based on the top three Civil Service scores" and that the SPD "had always promoted straight from the Civil Service eligibility lists." (Dkt. No. 85-1, ¶ 9).

## III.    STANDARD OF REVIEW

Under Rule 56(a), summary judgment may be granted only if all the submissions taken together "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). The moving party bears the initial burden of demonstrating "the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323. A fact is "material" if it "might affect the outcome of the suit under the governing law" and is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248; *see also Jeffreys v. City of New York*, 426 F.3d 549, 553 (2d Cir. 2005) (citing *Anderson*, 477 U.S. at 248). The movant may meet this burden by showing that the nonmoving party has "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322; *see also Selevan v. N.Y. Thruway Auth.*, 711 F.3d 253, 256 (2d Cir. 2013) (explaining that summary judgment is appropriate where the nonmoving party fails to "'come forth with evidence sufficient to permit a reasonable juror to return a verdict in his or her favor on' an essential element of a claim" (quoting *In re Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d 501, 509 (2d Cir. 2010))).

If the moving party meets this burden, the nonmoving party must "set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 248, 250; *see also Celotex*, 477 U.S. at 323–24; *Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009). "When ruling on a summary judgment motion, the district court must construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences

24

against the movant." *Dallas Aerospace, Inc. v. CIS Air Corp.*, 352 F.3d 775, 780 (2d Cir. 2003).

Still, the nonmoving party "must do more than simply show that there is some metaphysical

doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574,

586 (1986), and cannot rely on "mere speculation or conjecture as to the true nature of the facts

to overcome a motion for summary judgment," *Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 12 (2d

Cir. 1986) (citing *Quarles v. Gen. Motors Corp.*, 758 F.2d 839, 840 (2d Cir. 1985)).

Furthermore, "[m]ere conclusory allegations or denials . . . cannot by themselves create a

genuine issue of material fact where none would otherwise exist." *Hicks v. Baines*, 593 F.3d 159,

166 (2d Cir. 2010) (quoting *Fletcher v. Atex, Inc.*, 68 F.3d 1451, 1456 (2d Cir. 1995)).

## IV.    DISCUSSION

Defendants move for summary judgment and seek dismissal of Plaintiff's claims in their

entirety. (Dkt. No. 77-1, at 9). Plaintiff brings the following claims: (1) disability discrimination

claims under the ADA and RHA against the City; (2) disability discrimination claims against the

City, Chief Buckner and Deputy Chief Shoff under the NYSHRL; (3) gender discrimination

claims under the Fourteenth Amendment and NYSHRL against the City, Chief Buckner, and the

Deputy Chief Defendants; (4) a race discrimination claim under Title VII against the City; (5)

race discrimination claims under the Fourteenth Amendment and § 1981 against the City and

Chief Buckner; (6) retaliation claims against the City under the ADA and RHA; (7) retaliation

claims against the City and Chief Buckner under the Fourteenth Amendment and NYSHRL; and

(8) a tortious interference claim against Chief Buckner and the Deputy Chiefs. (Dkt. No. 87, at

17–18). Plaintiff opposes Defendants' motion. (Dkt. Nos. 87, 88).

### A.    Disability Discrimination - ADA & RHA – City

Defendants move for summary judgment dismissing Plaintiff's claim that the City

subjected her to unlawful disability discrimination when it denied her promotion to sergeant,

arguing that "Plaintiff cannot demonstrate that the Chiefs' preferences for other candidates was a pretext for disability discrimination." (Dkt. No. 77-1, at 33–36). Defendants also move for summary judgment dismissing Plaintiff's claims that the City subjected her to unlawful disability discrimination when it denied her § 207-c Application because this claim is barred by the statute of limitations and because, in any event, Plaintiff's § 207-c Application was denied for a nondiscriminatory reason. (*Id.* at 36–39). Plaintiff opposes Defendants' motion. (Dkt. No. 87, at 19–25).

The ADA prohibits covered entities from "discriminat[ing] against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). Claims of disability discrimination brought pursuant to the ADA and RHA are generally subject to the burden-shifting standard set forth in *McDonnell Douglas Corporation v. Green*, 411 U.S. 792 (1973). *McBride v. BIC Consumer Prods. Mfg. Co., Inc.*, 583 F.3d 92, 96 (2d Cir. 2009) (ADA); *Sears-Barnett v. Syracuse Cmty. Health Ctr., Inc.*, 531 F. Supp. 3d 522, 541 (N.D.N.Y. 2021) (ADA and RHA). Under this framework, a plaintiff must first establish a prima facie disability discrimination claim, which requires showing that: (1) the employer is subject to the ADA, (2) the individual allegedly discriminated against "is disabled within the meaning of the ADA or perceived to be so by her employer," (3) the individual "was otherwise qualified to perform the essential functions of the job with or without reasonable accommodation," (4) the individual suffered an adverse employment action, and (5) the adverse action was imposed "because of her disability." *Davis v. N.Y.C. Dep't of Educ.*, 804 F.3d 231, 235 (2d Cir. 2015) (citing *Brady v. Wal-Mart Stores, Inc.*, 531 F.3d 127, 134 (2d Cir. 2008)); *see also Natofsky v. City of New York*, 921 F.3d 337, 348 (2d

Cir. 2019) (holding that an ADA plaintiff must prove that "the discrimination was the but-for cause of any adverse employment action"); *Clarkson v. Coughlin*, 898 F. Supp. 1019, 1037 (S.D.N.Y. 1995) ("The requirements for stating a claim under the ADA are virtually identical to those under § 504 of the Rehabilitation Act.").

If a plaintiff establishes a prima facie case of disability discrimination by "produc[ing] minimal evidentiary support for the claim of discriminatory motivation," the "burden of production shifts to the employer to articulate a non-discriminatory reason for the adverse employment action." *Davis*, 804 F.3d at 235. If the employer does so, the plaintiff "must 'demonstrate that the proffered reason was not the true reason for the employment decision." *Brizzi v. Utica Mut. Ins. Co.*, 529 F. Supp. 3d 44, 54 (E.D.N.Y. 2021) (citation omitted); *see also Sista v. CDC Ixis N. Am., Inc.*, 445 F.3d 161, 169 (2d Cir. 2006) (noting that if a defendant employer proffers "a legitimate non-discriminatory reason for the [adverse action]," the plaintiff "must then produce evidence and carry the burden of persuasion that the proffered reason is a pretext"). "Although intermediate evidentiary burdens shift back and forth under this framework, the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *DeAngelo v. Yellowbook Inc.*, 105 F. Supp. 3d 166, 174 (D. Conn. 2015) (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143 (2000)).

### 1.    Failure to Promote

As Plaintiff notes in her opposition, in their memorandum of law, Defendants skip the first and second steps in the burden-shifting analysis and go directly to the third step: pretext.[16]

---

[16] Defendants argue that "Chief Buckner was not required to ignore the fact that Plaintiff had experienced difficulties performing in the high-stress Patrol environment when considering her for promotion simply because a disability may have contributed to the issues she experienced." (Dkt. No. 93, at 9). Such an argument implicates the third element of the prima facie case—the individual "was otherwise qualified to perform the essential functions of the job." *Davis*,

(*See* Dkt. No. 87, at 19 ("Defendants do not appear to argue that Plaintiff cannot make a *prima facie* showing that she was denied a promotion due to her PTSD.")). Plaintiff does not take issue with this omission but instead argues that because there is direct evidence of discrimination—namely, Chief Buckner's concern that Plaintiff's PTSD would impact her ability to assume the role of sergeant and supervise officers in a patrol capacity—the *McDonnell Douglas* framework is inapplicable. (*Id.*). The Court agrees. The Second Circuit recently reiterated this axiom of discrimination law, explaining:

> "[T]he *McDonnell Douglas* framework does not apply in every employment discrimination case." *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 511 (2002) (discussing *Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 121, (1985) ("*Thurston*")). "The shifting burdens of proof set forth in *McDonnell Douglas* are designed to assure that the plaintiff [has her] day in court *despite the unavailability* of *direct* evidence." *Thurston*, 469 U.S. at 121, (internal quotation marks omitted). The "*McDonnell Douglas* test is *inapplicable* where the plaintiff presents *direct* evidence of discrimination," *e.g.*, that the employer's motivation was "discriminatory on its face." *Id.*

*Porter v. Dartmouth-Hitchcock Med. Ctr.*, 92 F.4th 129, 149 (2d Cir. 2024) (alterations in original) (emphases in original).

Here, it is undisputed that "[a]round the time of [Plaintiff's] interview, Chief Buckner expressed concerns regarding Plaintiff's ability to perform in a supervisory role as a Sergeant based on the [panic] attacks and symptoms she previously experienced . . . to the Chiefs." (Dkt. No. 77-2, ¶ 56; Dkt. No. 85-6, ¶ 56). It is also undisputed that "[b]ased on" the "attacks and symptoms [Plaintiff] previously experienced" "Chief Buckner was uncomfortable promoting

---

804 F.3d at 235. Indeed, "courts are instructed to first determine 'whether the employer actually require[d] employees in the position to perform the functions that the employer asserts are essential.'" *Shannon v. N.Y.C. Transit Auth.*, 332 F.3d 95, 101 (2d Cir. 2003) (alteration in original) (quoting 29 C.F.R. pt. 1630 app. § 1630.2(n)). If so, "the inquiry will then center around whether removing the function would fundamentally alter that position." *Id.* (quoting 29 C.F.R. pt. 1630 app. § 1630.2(n)). But Defendants do not appear to argue that patrol is an essential function of a sergeant position; nor have they cited caselaw that suggests they are advancing such argument at this stage of the litigation.

[Plaintiff] to Sergeant without having her demonstrate that she was able to work effectively in the Patrol environment, and she was not selected for promotion." (Dkt. No. 77-2, ¶ 57; Dkt. No. 85-6, ¶ 57). Defendants argue that Chief Buckner's testimony that his concerns about the impact of Plaintiff's panic attacks and associated symptoms on her ability to "perform in a supervisory role as a Sergeant" and failure to demonstrate that she could "work effectively in the Patrol environment" despite her "attacks and symptoms" is not direct evidence because she "was not 'categorically disqualified' from the position." (Dkt. No. 93, at 7–8 (quoting *Pesce v. N.Y.C. Police Dep't*, 159 F. Supp. 3d 448, 458 (S.D.N.Y. 2016)). However, Plaintiff need not adduce evidence of categorical disqualification, she need only point to direct evidence in the record that the employment "decision . . . was based on her disability." *Porter*, 92 F.4th at 150. In *Porter*, for example, the plaintiff, who claimed disability-based termination, presented evidence that when a colleague asked the decision-maker why the plaintiff "was being terminated rather than retained," the decision-maker's "sole response was that [the plaintiff] was 'on disability.'" *Id.* Here, Chief Buckner submitted a declaration stating:

> it was my understanding that in the time period leading up to her transfer [from patrol to records], she was experiencing debilitating panic attacks that could be triggered by the many high stress situations that Patrol Officers face on a constant basis. Patrol Sergeants are expected to manage the officers under their supervision and to provide leadership in the face of stressful and dangerous situations where they are responsible for the safety of the officers and citizens. Given the difficulties Plaintiff had experienced in responding to such situations in the past, I did not feel comfortable promoting her to the role of Sergeant at that time.

(Dkt. No. 77-13, ¶ 27).

Thus, the Court finds Plaintiff has raised a material issue of fact regarding whether Defendants denied her promotion to sergeant based on disability. Accordingly, Defendants'

motion for summary judgment dismissing Plaintiff's ADA and RHA disability discrimination claims against the City are denied.[17]

### 2. Section 207-c Application

Defendants argue that any disability discrimination based on the denial of Plaintiff's § 207-c Application is time-barred because she knew or should have known that her request for § 207-c benefits was denied more than three years before she commenced the present action. (Dkt. No. 77-1, at 36–38). Defendants further argue that Plaintiff has failed to adduce evidence that the denial of her application was discriminatory. Plaintiff responds that her § 207-c Application is timely as the SPD did not deny her application for benefits until December 2020, and she filed this action in July 2021, less than a year later, and further argues that she has adduced evidence that SPD's denial of her application was based on impermissible disability discrimination—because it was a mental, as opposed to a physical, injury. (Dkt. No. 87, at 25–26).

### a. Statute of Limitations

"New York-based ADA claims" are subject to a three-year statute of limitations. *Purcell v. N.Y. Inst. of Tech. - Coll. of Osteopathic Med.*, 931 F.3d 59, 63 (2d Cir. 2019). Claims under the Rehabilitation Act and NYSHRL are likewise "subject to a three-year limitations period." *Am. Council of Blind of N.Y., Inc. v. City of N.Y.*, 495 F. Supp. 3d 211, 242 (S.D.N.Y. 2020); N.Y. C.P.L.R. § 214(2) (providing a three-year statute of limitations for discrimination claims). Further, it is well settled that a plaintiff's claims under such statutes accrue when the plaintiff

---

[17] Unsure of whether Plaintiff alleged a denial of a reasonable accommodation claim, Defendants requested that to the extent Plaintiff included such a claim, it be dismissed. (Dkt. No. 77-1, at 40-41). As Plaintiff does not respond to this argument or include a reasonable accommodation theory among her claims, (Dkt. No. 87, at 16–18), the Court concludes Plaintiff has not advanced such a claim in this case and Defendants' motion for summary judgment on this issue is therefore denied as moot.

"knew or had reason to know of the injury serving as the basis for [her] claim." *Harris v. City of New York*, 186 F.3d 243, 247 (2d Cir. 1999) (citing *Cornwell v. Robinson*, 23 F.3d 694, 703 (2d Cir.1994)); *see Washington v. Cnty. of Rockland*, 373 F.3d 310, 319 (2d Cir. 2004) ("As with all discrimination claims, plaintiffs' claims accrued when they knew or should have known of the discriminatory action."). In discrimination actions, courts focus "on the time of the discriminatory act, not the point at which the consequences of the act become painful," *Chardon v. Fernandez*, 454 U.S. 6, 8 (1981), and thus measure the timeliness of a discrimination claim "from the date the claimant receives notice of the allegedly discriminatory decision, not from the date the decision takes effect," *O'Malley v. GTE Serv. Corp.*, 758 F.2d 818, 820 (2d Cir. 1985).

Plaintiff filed this action on June 28, 2021. (Dkt. No. 1). Thus, her § 207-c denial of benefits claim must have accrued on or after June 28, 2018 to be timely. Defendants argue that Plaintiff knew or should have known that her § 207-c Application for benefits for her PTSD injury was denied, at the latest, in November 2017, after her § 207-c Application for benefits for a physical injury was granted, and at which point she stated that she did not further pursue her § 207-c Application for PTSD symptoms because "it was still very clear to me that they were not willing to cover it." (Dkt. No. 77-4, at 3). Plaintiff does not dispute this but argues that "Defendants conveniently ignore . . . that Plaintiff had no ability to appeal or otherwise challenge a 'feeling' that her application would be denied" and asserts that "it is simply not true that Plaintiff's claim was ever denied prior to December 2020." (Dkt. No. 87, at 25).

Although there is evidence that Plaintiff inferred from the conversations with Deputy Chief Cecile and Piedmonte, the referral to Dr. Fayer in New York City for examination, and the SPD's lengthy inaction despite her repeated requests for a decision that SPD was "not willing to cover" her PTSD injury by providing benefits under § 207-c, it is undisputed that the first time

the SPD communicated the denial of Plaintiff's § 207-c Application was on December 9, 2020.

Thus, the Court concludes that this is the date Plaintiff's discriminatory denial claim accrued. *See*

*Del. State Coll. v. Ricks*, 449 U.S. 250, 258–59 (1980) (finding that the plaintiff's claim accrued

when the relevant decision was made and communicated to the plaintiff, not on the date that the

plaintiff experienced the effects of that decision); *see also Flaherty v. Metromail Corp.*, 235 F.3d

133, 137 (2d Cir. 2000) ("In discriminatory discharge cases . . . the illegal act is often the

decision to terminate the employee, and the limitations period begins to run on the date that the

employer gives definite notice of that decision to the employee."); *Zaja v. SUNY Upstate Med.*

*Univ./Upstate Healthcare Ctr.*, No. 20-cv-337, 2022 WL 16834054, at *3, 2022 U.S. Dist.

LEXIS 203826, at *7 (N.D.N.Y. Nov. 9, 2022) (finding that "the date that Plaintiff became

aware of the decision that his contract would not be renewed is the correct accrual date" for

purposes of discrimination claim). As Plaintiff filed this action on or about June 28, 2021, (Dkt.

No. 1, at 1), within three years of receiving the decision denying her § 207-c Application, her

claim is therefore timely. Accordingly, Defendants' motion for summary judgment dismissing

Plaintiff's § 207-c Application as barred by the statute of limitations is denied.

### b.    Merits

Again, Defendants do not address whether Plaintiff has adduced evidence of a prima

facie case of disability discrimination but jump straight to the second step of the burden-shifting

framework, arguing that "Plaintiff was denied 207-c benefits for a non-discriminatory reason,"

namely, that her PTSD was not the result of an on-duty injury. (Dkt. No. 77-1, at 38). Plaintiff

responds in kind, proceeding to the final step, arguing that "[t]he differential treatment between

psychological and physical on-duty injuries is clear evidence of discriminatory animus and

pretext." (Dkt. No. 87, at 25). Given the evidence Plaintiff has presented showing that: Chief

Fowler told Piedmonte that "he was reluctant to allow 207-c benefits for PTSD in particular

because that would 'open the floodgates,'" (Dkt. No. 85-1, ¶ 4); the SPD sought an outside

opinion and required an independent medical examination by Dr. Fayer in New York City; and

although Dr. Fayer issued his report in December 2016, the SPD failed to make a determination

for more than two years despite Plaintiff's repeated requests, while, by contrast, it granted

Plaintiff's November 2017 § 207-c Application for physical injury without hesitation or

requiring an additional examination, the Court finds that Plaintiff has adduced evidence from

which a reasonable fact-finder could conclude that but-for discriminatory animus against injuries

to mental illness, her § 207-c Application would not have been denied. *See Natofsky*, 921 F.3d at

348 ("[T]he ADA requires a plaintiff alleging a claim of employment discrimination to prove

that discrimination was the but-for cause of any adverse employment action."). Accordingly,

Defendants' motion for summary judgment with respect to Plaintiff's § 207-c disability

discrimination claim is denied.

### B.    Disability Discrimination – NYSHRL – City, Buckner & Shoff

Defendants seek summary judgment dismissing Plaintiff's NYSHRL disability

discrimination claims against the City and the "the Deputy Chiefs." (Dkt. No. 77-1, at 49–52). In

her response, Plaintiff clarifies that she only intends to pursue NYSHRL disability discrimination

claims against Chief Buckner and Deputy Chief Shoff (first and second promotion cycles).[18]

(Dkt. No. 87, at 16). Having concluded that material issues of fact preclude summary judgment

---

[18] Nothing in the briefing before the Court suggests that Plaintiff seeks to pursue a NYSHRL claim stemming from her § 207-c claim against any individual Defendant. Plaintiff included a chart in her memorandum in opposition containing all her claims and the individual defendants against whom she asserts each claim. (Dkt. No. 87, at 16–17). Plaintiff identifies only Chief Buckner and Deputy Chief Shoff in connection with her NYSHRL disability discrimination claim. (*Id.* at 16). Plaintiff does not argue, and there are no facts in the record showing, that either Chief Buckner or Deputy Chief Shoff actually participated in deciding her § 207-c Application. There is evidence that Chief Buckner investigated the status of her claim and communicated the denial, but there is no evidence that he was involved in any other capacity. Indeed, Buckner did not become Chief until more than a year after Plaintiff's September 2016 § 207-c Application. Accordingly, the Court concludes Plaintiff does not seek to pursue a disability-based NYSHRL claim related to her § 207-c Application against any individual defendant.

as to the City in connection with Plaintiff's ADA and RHA claims, the Court finds summary judgment as to the City in connection with Plaintiff's NYSHRL disability discrimination claims is likewise precluded, *Tafolla v. Heilig*, 80 F.4th 111, 118 (2d Cir. 2023) (applying the same standard applicable to ADA claims to a NYSHRL claim), and thus considers Plaintiff's claims against Chief Buckner and Deputy Chief Shoff.

Section 296(6) of the NYSHRL states that "[i]t shall be an unlawful discriminatory practice for any person to aid, abet, incite, compel or coerce the doing of any of the acts forbidden under this article [including discrimination and retaliation], or to attempt to do so." N.Y. Exec. Law § 296(6). The Court of Appeals of New York has stated that § 296(6) "extends liability to persons and entities beyond . . . employers, and this provision should be construed broadly." *Griffin v. Sirva, Inc.*, 29 N.Y.3d 174, 187 (2017). "The NYSHRL allows for individual liability under two theories: (1) if the defendant has 'an ownership interest' in the employer or has 'the authority to hire and fire employees,' and (2) if the defendant aided and abetted the unlawful discriminatory acts of others." *E.E.O.C. v. Suffolk Laundry Servs., Inc.*, 48 F. Supp. 3d 497, 523 (E.D.N.Y. 2014) (internal citations omitted) (first quoting *Tomka v. Seiler Corp.*, 66 F.3d 1295, 1317 (2d Cir. 1995); and then citing N.Y. Exec. Law § 296(6)). Thus, an individual who "'actually participates in the conduct giving rise to a discrimination claim' [may] be held liable under the NYSHRL." *Feingold v. New York*, 366 F.3d 138, 158 (2d Cir. 2004) (quoting *Tomka*, 66 F.3d at 1317).

Here, Plaintiff has introduced evidence that Chief Buckner was directly involved in the interviews and hiring decisions during each promotion cycle at issue in this case, that each time, he skipped over Plaintiff, and that "one of the reasons" he did so was his concern about her PTSD diagnosis and how it would impact her supervisory abilities. (Dkt. No. 84-3, at 142). This

evidence is sufficient to raise a material issue of fact as to Chief Buckner's actual participation in disability-based discriminatory conduct toward Plaintiff in refusing her promotion to sergeant. In arguing that Deputy Chief Shoff is entitled to summary judgment dismissing Plaintiff's disability-based failure to promote claim, Defendants argue that Chief Buckner had the sole decision-making power, that his decision not to promote Plaintiff "did not stem from any input on the party of the Deputy Chiefs," and that there is no evidence that Deputy Chief Shoff "sought to deny Plaintiff promotion due to a discriminatory animus." (Dkt. No. 77-1, at 52). As Defendants do not specifically move for summary judgment as to the NYSHRL disability discrimination claim against Chief Buckner, and it is undisputed that he was the primary actor, the claim against him will proceed.

Plaintiff has also adduced evidence that Deputy Chief Shoff participated in the first and second promotion cycle interviews and discussed Plaintiff's PTSD with Chief Buckner in the context of those promotion decisions. Indeed, Chief Buckner described the meeting he had with the Deputy Chiefs, including Deputy Chief Shoff following Plaintiff's interview: "We made the decision based upon the fact that information that she had shared with me and after hearing her testimony about that I shared her concern and I was uncomfortable with promoting her back to the road absent being able to show that she could work under those conditions in an operational capacity." (Dkt. No. 84-3, at 40–41). Chief Buckner further testified that the decisions regarding the denial of promotions were "unanimous." (Dkt. No. 84-3, at 130). This is sufficient to raise a material issue of fact as to Deputy Chief Shoff's actual participation in the conduct—the interview and discussion surrounding the promotion decision—giving rise to Plaintiff's disability-based failure to promote claim. Accordingly, Defendants' motion for summary judgment dismissing Plaintiff's NYSHRL disability discrimination claim is denied.

## C.       Gender Discrimination – Fourteenth Amendment & NYSHRL – City, Chief Buckner, Deputy Chiefs

Defendants move for summary judgment dismissing Plaintiff's Fourteenth Amendment (§ 1983) and NYSHRL failure to promote based on gender claim. (Dkt. No. 77-1, at 23–33). Plaintiff opposes Defendants' motion, arguing that the SPD repeatedly passed her over for promotion to sergeant in favor of male officers. (Dkt. No. 87, at 11).

Before proceeding to the merits of the parties' arguments, the Court must discuss the federal statute under which Plaintiff brings her gender discrimination claim: § 1983. (Dkt. No. 87, at 17 (chart showing Fourteenth Amendment gender discrimination claim against City under § 1983).To hold the City liable, Plaintiff must establish municipal liability under *Monell v. Department of Social Services*, 436 U.S. 658, 694 (1978). "For the purpose of Section 1983, a municipality is not vicariously liable for the acts of its employees," *Green v. City of New York*, 465 F.3d 65, 80 (2d Cir. 2006) (citing *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978)), but a municipality is liable when "execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury," *Monell*, 436 U.S. at 694. "To hold a [municipality] liable under § 1983 for the unconstitutional actions of its employees, a plaintiff is required to plead and prove three elements: (1) an official policy or custom that (2) causes the plaintiff to be subjected to (3) a denial of a constitutional right." *Lucente v. Cty. of Suffolk*, 980 F.3d 284, 297 (2d Cir. 2020) (quoting *Wray v. City of New York*, 490 F.3d 189, 195 (2d Cir. 2007)). However, nowhere in their briefing do Defendants discuss whether Plaintiff has adduced evidence from which a reasonable factfinder could find the City liable for gender discrimination under *Monell*. Perhaps this is due to the evidence of Buckner's role as Chief of Police, and direct involvement in denying Plaintiff promotion during each promotional cycle, which may be sufficient to create a

36

material issue of fact as to whether he was a final policy maker. *See Pembaur*, 475 U.S. at 482–83 (explaining that a policymaker is one who is "responsible for establishing final government policy respecting [the relevant category of] activity"). In any event, in the absence of briefing, the Court assumes there are material issues of fact regarding municipal liability and proceeds to discuss the merits.[19]

"A plaintiff who claims sex discrimination in public employment in violation of the Fourteenth Amendment may bring suit pursuant to § 1983." *Naumovski v. Norris*, 934 F.3d 200, 212 (2d Cir. 2019). In general, § 1983 claims and NYSHRL claims are analyzed under the same burden shifting analysis outlined below as Title VII claims and subject to the same elements, *Back v. Hastings on Hudson Free Sch. Dist.*, 365 F.3d 107, 122 (2d Cir. 2004); *Tolbert*, 790 F.3d at 434 ("Title VII . . . and NYSHRL discrimination claims are governed at the summary judgment stage by the burden-shifting analysis."), but there are four "crucial distinction[s]" between Title VII and § 1983 claims,[20] *Naumovski*, 934 F.3d at 212–13, all of which are relevant here. First, "a plaintiff advancing a claim pursuant to § 1983 must" establish that "the alleged deprivation was committed by a person acting under color of state law." *Id.* at 212. Here, it is undisputed that Chief Buckner and Deputy Chiefs Shoff, McGork, Cecile, and Trudell were state actors and thus proper defendants for purposes of a § 1983 claim. "Second, unlike a Title VII claim, which may be brought only against the employing entity, a § 1983 claim 'can be brought against an[y] individual' responsible for the discrimination." *Id.* Plaintiff brings her § 1983 (and NYSHRL) claims against the City, Chief Buckner and Deputy Chiefs Shoff, McGork, Cecile,

---

[19] The Court continues this assumption with respect to Plaintiff's §§ 1983, 1981 race discrimination claims.

[20] "[I]t is well-established that the substantive standards for liability under the NYSHRL and Title VII are coextensive: '[C]laims brought under New York State's Human Rights Law are analytically identical to claims brought under Title VII.'" *Vuona v. Merrill Lynch & Co.*, 919 F. Supp. 2d 359, 393 (S.D.N.Y. 2013) (quoting *Rojas v. Roman Catholic Diocese of Rochester*, 660 F.3d 98, 107 n.10 (2d Cir. 2011)). However, there is one relevant difference—unlike Title VII, the NYSHRL allows for individual liability. *Rojas*, 660 F.3d at 107 n.10.

and Trudell, individually. "Third, while an employer may be liable under Title VII for any discriminatory conduct that can properly be attributed to the employer through agency principles," to establish liability under § 1983, a plaintiff must show that the individual defendant "personally violated a plaintiff's constitutional rights." *Id.* Fourth, Title VII's "required degree of causation" for a gender discrimination claim—proof that discrimination was a "motivating factor"—is lesser than § 1983's, which is more stringent and requires proof that "the defendant's discriminatory intent was a 'but-for' cause of the adverse employment action or the hostile environment." *Id.* at 214.

Under the burden-shifting framework, the plaintiff must first establish, by a preponderance of the evidence, a prima facie case of discrimination. *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506 (1993). "The requirements to establish a prima facie case are 'minimal,' and a plaintiff's burden is therefore 'not onerous.'" *Bucalo v. Shelter Island Union Free Sch. Dist.*, 691 F.3d 119, 128 (2d Cir. 2012) (first quoting *Hicks*, 509 U.S. at 506; then quoting *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981)). The "[e]stablishment of a prima facie case . . . creates a presumption that the employer unlawfully discriminated against the employee." *Burdine*, 450 U.S. at 254. The burden then shifts to the defendant, who must articulate a legitimate, nondiscriminatory reason for its actions. *Hicks*, 509 U.S. at 506–07. If the defendant carries that burden, the presumption of discrimination "drops from the picture," and the burden shifts back to the plaintiff, who must "come forward with evidence that the defendant's proffered, non-discriminatory reason is a mere pretext for actual discrimination." *Weinstock v. Columbia Univ.*, 224 F.3d 33, 42 (2d Cir. 2000); *see also Kwan v. Andalex Grp., LLC*, 737 F.3d 834, 845 (2d Cir. 2013). In the pretext inquiry the court is "decidedly not interested in the truth of the allegations against plaintiff," but rather is "interested in what

motivated the employer." *Toussaint v. NY Dialysis Servs., Inc.*, 706 F. App'x 44, 45–46 (2d Cir.

2017) (summary order) (quoting *McPherson v. N.Y.C. Dep't of Educ.*, 457 F.3d 211, 216 (2d Cir.

2006)).

### 1.    Prima Facie Case

To establish a prima facie case of employment discrimination under § 1983 and the

NYSHRL, a plaintiff must show that: "(1) [s]he is a member of a protected class; (2) [s]he was

qualified for the position [s]he held; (3) [s]he suffered an adverse employment action; and (4) the

adverse action took place under circumstances giving rise to an inference of discrimination."

*Ruiz v. Cty. of Rockland*, 609 F.3d 486, 491–92 (2d Cir. 2010). The fourth factor of this test may

be satisfied "through direct evidence of intent to discriminate, or by indirectly showing

circumstances giving rise to an inference of discrimination." *Vega*, 801 F.3d at 87 (internal

citations omitted). Plaintiff has satisfied the first and second factors because it is undisputed that

as a woman, she is a member of a protected class and that she was qualified to be a sergeant. In

addition, Defendants do not dispute the failure to promote to sergeant is an adverse action.

Accordingly, the Court need only consider whether Plaintiff has presented any evidence that

would permit an inference that the failure to promote was attributable to gender discrimination.

Inference of discrimination is a "flexible [standard] that can be satisfied differently in

differing factual scenarios." *Howard v. MTA Metro-N. Commuter R.R.*, 866 F. Supp. 2d 196, 204

(S.D.N.Y. 2011) (quoting *Chertkova v. Conn. Gen. Life Ins. Co.*, 92 F.3d 81, 91 (2d Cir. 1996)).

"No one particular type of proof is required to show that [the adverse employment action]

occurred under circumstances giving rise to an inference of discrimination." *Ofoedu v. St.*

*Francis Hosp. & Med. Ctr.*, No. 04-cv-1707, 2006 WL 2642415, at *14, 2006 U.S. Dist. LEXIS

68704, at *49 (D. Conn. Sept. 13, 2006). "An inference of discrimination can arise from

circumstances including, but not limited to, the employer's criticism of the plaintiff's

performance in . . . degrading terms [related to a protected class]; or its invidious comments about others in the employee's protected group; . . . or the sequence of events leading" up to the adverse action. *Littlejohn v. City of New York*, 795 F.3d 297, 312 (2d Cir. 2015) (internal quotation marks omitted). An inference of discrimination can also arise from evidence "that an 'employer subjected [an employee] to disparate treatment, that is, treated him less favorably than a similarly situated employee outside his protected group.'" *Vuona v. Merrill Lynch & Co.*, 919 F. Supp. 2d 359, 372 (S.D.N.Y. 2013) (quoting *Graham v. Long Island R.R.*, 230 F.3d 34, 39 (2d Cir. 2000)).

Plaintiff argues that an inference of gender-based discrimination arises from: (1) gender-related remarks showing bias by decision-makers; and (2) evidence of disparate treatment, specifically, that Defendants treated her less favorably that her male counterparts in the handling of her § 207-c Application and during the promotional cycles, by, inter alia, skipping Plaintiff and promoting at least eight male officers with lower civil service scores than Plaintiff, and promoting male officers who had not recently worked in Patrol while denying Plaintiff promotion on the basis that she had not worked in Patrol recently. (Dkt. No. 87, at 11–12).

### a.      Gender-Related Remarks

Plaintiff testified that in "early 2020," Deputy Chief Shoff, another individual, and Plaintiff were "at Lamson Road" and talking about a female employee who had not "made it through the full [police] academy," when Deputy Chief Shoff "made a comment because she hadn't made it as a police officer and thought maybe she was too girly." (Dkt. No. 84-2, at 190). Defendants argue this is a "stray remark," that it "was not even directed at Plaintiff, that it "was made by just one of four Deputy Chiefs who provided input to Chief Buckner," and this is "insufficient to support an inference of discriminatory intent in the first instance." (Dkt. No. 77-1, at 24).

40

In considering whether a remark is probative, district courts in this circuit have considered four factors: "(1) who made the remark (i.e., a decision-maker, a supervisor, or a low-level co-worker); (2) when the remark was made in relation to the employment decision at issue; (3) the content of the remark (i.e., whether a reasonable juror could view the remark as discriminatory); and (4) the context in which the remark was made (i.e., whether it was related to the decision-making process)." *Henry v. Wyeth Pharms., Inc.*, 616 F.3d 134, 149 (2d Cir. 2010); *see Tomassi*, 478 F.3d at 115.

As to the first factor, Deputy Chief Shoff was part of the group responsible for advising Chief Buckner regarding sergeant promotional positions and communicated directly with Plaintiff regarding Chief Buckner's recommendation that obtaining additional patrol experience would improve her chances of promotion. As to the second factor, Plaintiff could not "remember exactly" when Deputy Chief Shoff made the remark and could only place it as occurring in "[e]arly 2020." (Dkt. No. 84-2, at 190). Thus, by Plaintiff's account it was made between four and six months prior to her June 2020 sergeant interview with Chief Buckner and the Deputy Chief. The four to six months between the remark and the first denial of promotion render the remark less probative. *See Yagudaev v. Credit Agricole Am. Servs.*, 2020 WL 583929, at *13, 2020 U.S. Dist. LEXIS 20328, at *35 (S.D.N.Y. Feb. 6, 2020) (collecting cases for proposition that, without more, statements made "a few months" before an adverse action are nonprobative). As to the third factor, a reasonable juror could view the remark that a recruit was "too girly" to make it through the police academy as a negative comment about women as police officers, and thus discriminatory. However, as to the fourth factor, there is no evidence that this comment, which Deputy Chief Shoff purportedly made during a conversation approximately six months earlier, had any connection to Plaintiff or to the promotional decision-making process. *See Smith*

*v. N.Y. & Presbyterian Hosp.*, 440 F. Supp. 3d 303, 338 (S.D.N.Y. 2020) (finding remark by the

plaintiff's supervisor that if she filed another EEOC complaint, "'they' would say that she was

'playing the black card again,'" made after one adverse action and "four months before" another

alleged adverse action, was "of little probative value" and noting that there was no evidence "that

ties this statement to an employment decision or suggests that [supervisor] was explaining his

motivations for any such decision"); *see also Wesley-Dickson v. Warwick Valley Cent. Sch. Dist.*,

586 F. App'x 739, 743 (2d Cir. 2014) (summary order) (finding racially biased remarks did "not

raise a triable issue of employment discrimination" where the speaker "did not review plaintiff's

work, write any performance reviews, or otherwise influence school superintendents' decisions

to extend plaintiff's probationary term or to deny her tenure" and where there was no temporal

connection between the remarks and adverse employment action (citing *Tomassi v. Insignia Fin.

Grp.*, 478 F.3d 111, 115 (2d Cir. 2007))).

     Further, the Court finds Chief Buckner's response to a deposition question about whether

he had "heard" of the stereotype that women were "likely to get pregnant and go out sick?" is not

evidence from which a reasonable factfinder could infer gender-based discriminatory intent.

(Dkt. No. 84-3, at 198). Chief Buckner responded: "No, I don't believe that's a stereotype" but

stated that it was "a reality that women certainly are the ones that get pregnant." (Dkt. No. 84-3,

at 198). Plaintiff fails to articulate any argument connecting this comment to Chief Buckner's

decision to deny promotion.

### b.    Disparate Treatment

The Second Circuit has explained disparate treatment as follows:

> "A showing of disparate treatment—that is, a showing that an
> employer treated plaintiff 'less favorably than a similarly situated
> employee outside his protected group'—is a recognized method of
> raising an inference of discrimination for the purposes of making
> out a prima facie case." *Mandell v. County of Suffolk*, 316 F.3d 368,

> 379 (2d Cir. 2003). An employee is similarly situated to co-
> employees if they were (1) "subject to the same performance
> evaluation and discipline standards" and (2) "engaged in
> comparable conduct." *Graham v. Long Island R.R.*, 230 F.3d 34, 40
> (2d Cir. 2000). "[T]he standard for comparing conduct requires a
> reasonably close resemblance of the facts and circumstances of
> plaintiff's and comparator's cases, rather than a showing that both
> cases are identical." *Id.* In other words, the comparator must be
> similarly situated to the plaintiff "in all material respects." *Shumway
> v. United Parcel Serv., Inc.*, 118 F.3d 60, 64 (2d Cir. 1997).

*Ruiz v. Cnty. of Rockland*, 609 F.3d 486, 493–94 (2d Cir. 2010). "Whether two employees are

similarly situated ordinarily presents a question of fact for the jury." *Graham v. Long Island

R.R.*, 230 F.3d 34, 39 (2d Cir. 2000).

### i.     Light Duty

As evidence of gender discrimination, Plaintiff points to Defendants' alleged disparate

treatment of a Black male "FID"[21] officer, who "injured himself in a basketball game" in 2011.

(Dkt. No. 87, at 11; Dkt. No. 93-1, ¶ 5). It is undisputed that Plaintiff and the officer were subject

to the same performance evaluation and discipline standards. However, as discussed, the

characterization of Plaintiff's PTSD as an on-duty or off-duty injury is contested in this case.

Further, Plaintiff appears to dispute the propriety of Defendants' characterization of the officer's

basketball injury as on-duty. (Dkt. No. 84-2, at 231 (Plaintiff testifying that "[h]e's involved in

an off-duty basketball game, hurts . . . his leg . . . and that's covered"). These disputes are

immaterial. Even assuming Plaintiff and the officer both had off-duty (or on-duty) injuries,[22]

Plaintiff has failed to present sufficient facts from which a reasonable factfinder could infer they

were treated differently with respect to light duty. Plaintiff has presented evidence that after her

---

[21] Although Plaintiff does not provide an explanation as to what "FID" stands for it is undisputed that this officer was
an SPD officer. (Dkt. No. 93-1, ¶ 3).

[22] Plaintiff only argues that the "accommodations" Defendants made for a male officer injured off-duty, but denied
her, show gender-based disparate treatment. (Dkt. No. 87, at 11). Plaintiff does not argue that the on-duty/off-duty
determinations show gender-based disparate treatment.

physician released her to return to light duty, a Sergeant in the Human Resources Division and Deputy Chief Cecile responded that she could return to light duty for one month, after which she would return to Patrol. (Dkt. No. 84-1, at 71). Plaintiff "stay[ed] out." (Dkt. No. 84-1, at 71). Although Plaintiff has presented evidence that Defendants gave the FID officer a "light duty position . . . in the chief's office," following his injury, she fails to provide any additional factual details, and provides no facts whatsoever regarding the length of time Defendants allowed the FID officer to work light duty. If, for example, there was evidence that Defendants allowed the FID officer to work light duty for sixty days, there would be a basis for a fact finder to conclude Plaintiff and the FID officer were treated differently. However, without further factual details, Plaintiff has failed to raise a material issue of fact as to whether Defendants treated Plaintiff and the FID officer differently. Thus, Plaintiff's assertion of gender discrimination as the reason for difference in treatment is little more than speculation and no reasonable factfinder could draw an inference of gender-related bias.

### ii.    Promotional Cycles

Plaintiff next argues that Defendants' alleged disparate treatment of male Police Officers, many of whom were promoted during the promotional cycles at issue despite having lower civil service exam scores than Plaintiff, allows an inference of gender-based discriminatory intent. (Dkt. No. 87, at 11–12). The Court agrees.

Chief Buckner explained that the New York Civil Service Law's "Rule of Three" provides that the SPD "can only promote police officers to sergeant" if "they are one of the top three individuals on the list, not counting those already appointed and those who decline to be promoted." (Dkt. No. 77-13, ¶ 14). In this case, there is evidence that during the relevant promotional cycles, Plaintiff was the highest scoring officer not promoted, and that of the three

women eligible for promotion, one withdrew (K.B.), one was promoted (C.L.), and one was not

promoted (Plaintiff):

| Name | Race/Gender | Score | Promotional Status |
|------|-------------|-------|--------------------|
| 1.   P.M. | White Male | 99 | Promoted 9/2020 |
| 2.   B.L. | White Male | 86 | Promoted 9/2020 |
| 3.   C.G. | White Male | 84 | Promoted 6/2021 |
| 4.   D.R. | White Male | 84 | Promoted 6/2021 |
| 5.   Alison Beauchine | White Female | 83 | Not Promoted |
| 6.   C.R. | Black Male | 81.5 | Promoted 9/2020 |
| 7.   W.C. | White Male | 81 | Not Promoted |
| 8.   K.B. | White Female | 80 | Withdrew |
| 9.   D.K. | White Male | 80 | Promoted 6/2021 |
| 10. K.A. | White Male | 79 | Promoted 2/2021 |
| 11. D.P. | White Male | 79 | Promoted 11/2020 |
| 12. S.B. | White Male | 78 | Promoted 11/2020 |
| 13. M.L. | White Male | 77 | Promoted 11/2020 |
| 14. J.S. | White Male | 77 | Promoted 11/2020 |
| 15. C.L. | Black Female | 76 | Promoted 2/2021 |
| 16. D.M. | Black Male | 76 | Interviewed |
| 17. A.R. | White Male | 75 | Not Interviewed |
| 18. C.K. | White Male | 74 | Not Interviewed |

(Dkt. No. 84-14, at 5; Dkt. No. 77-13, ¶ 70; Dkt. No. 84-15, at 3–4).[23]

During the first promotional cycle, P.M., B.L., and C.R. were promoted to sergeant. (Dkt.

No. 77-13, ¶ 21). P.M. and B.L. were reachable under the "Rule of Three" as they had the two

highest scores. (*Id.* ¶ 53). C.G. and D.R. declined the promotional opportunity, making Plaintiff

third on the list. (Dkt. No. 77-13, ¶ 20). According to Chief Buckner, he is "permitted to skip one

or two of the top three on the list for any non-discriminatory reason, as long as the person we

select is still within the top three." (Dkt. No. 77-13, ¶ 14). Chief Buckner and the Deputy Chiefs

"decided to skip Plaintiff" "[g]iven the difficulties Plaintiff had experienced in responding to

[stressful and dangerous] situations in the past" due to "debilitating panic attacks." (Dkt. No. 77-

---

[23] The parties do not discuss D.M., A.R., or C.K. in their briefing. Accordingly, the Court has not considered these individuals in its analysis.

13, ¶¶ 27–28). As C.G. and D.R. had declined, and as Defendants had skipped Plaintiff, C.R. became third on the list and was promoted. Plaintiff asserts that C.R., a male officer, "who had been recommended by a physician not to return to the road due to emotional problems was promoted over Plaintiff with a lower civil service score."[24] (Dkt. No. 87, at 24; *see* Dkt. No. 84-40).

During the second promotional cycle, Plaintiff had the third-highest score among promotable officers: C.G. and D.R. were first and second, with scores of 84, and Plaintiff was third, with a score of 83. (Dkt. No. 77-13, ¶ 49). C.G. and D.R. again declined promotion and Chief Buckner again skipped Plaintiff, explaining that "[w]e did not promote Plaintiff in this November round of promotions for the same reason she was not promoted . . . in December." (*Id.* ¶¶ 35, 50). Chief Buckner also skipped the fourth officer on the list, W.C. (score 81), because he was concerned about W.C.'s history of excessive crashes in his police vehicle and instructed him "that he needed to display an ability to work patrol without additional car crashes." (*Id.* ¶ 36). The fifth officer on the list, D.K. (score 80) declined promotion. (*Id.* ¶ 49). Chief Buckner skipped the sixth officer on the list, K.A. (score 79), as K.A.'s supervisor had expressed a concern that K.A. was indecisive, "a problematic trait for a Sergeant on patrol who has to make quick decisions in tense situations." (*Id.* ¶ 31). With C.G., D.R., and D.K. having declined, (*id.* ¶¶ 35, 49–51), and Plaintiff, W.C., and K.A. having been skipped, D.P., S.B., J.S., and M.L.—all white males (scores 79, 78, 77, and 77, respectively), were reachable and promoted to sergeant, (Dkt. No. 77-2, ¶ 66; Dkt. No. 85-6, ¶ 66).

---

[24] Chief Buckner states that this information was not in C.R.'s interview packet, did not come up in C.R.'s interview or "in any meeting held thereafter to debrief with the Deputy Chiefs." (Dkt. No. 77-13, ¶ 26). Plaintiff states in her affirmation that she is "aware" that "prior to [C.R.'s] promotion . . . Captain Lynch informed [Deputy] Chief Trudell of [C.R.'s] removal from the road due to illegal and unsafe behaviors he exhibited while Lynch was his supervisor and a Department-ordered fit for duty psychological evaluation." (Dkt. No. 85, ¶ 15).

During the third promotional cycle, Chief Buckner again skipped Plaintiff "because she still had not taken any steps to work patrol, and so [his] view of her preparedness and qualifications to be a Patrol supervisor had not changed." (Dkt. No. 77-13, ¶ 52). D.K. again declined promotion. (*Id.* ¶ 51). As a result, K.A. (score 79), and C.L. (score 76), were the two highest scorers on the civil service list and were promoted to sergeant. (*Id.* ¶ 47).

During the fourth promotional cycle, Defendants promoted C.G., D.R., and D.K.. (*Id.* ¶ 50). C.G. and D.R. had higher scores (84) than Plaintiff, and Chief Buckner again skipped Plaintiff for the same reasons, making D.K. reachable for promotion. (*Id.* ¶¶ 49–52).

Viewed in the light most favorable to Plaintiff, the evidence that during the four promotional cycles at issue, Plaintiff ranked in the top three on the civil service list, an objective mechanism for identifying the three individuals eligible for promotion to sergeant, but was skipped each time based on subjective factors, and a male police officer was promoted instead, is sufficient at the prima facie stage to permit an inference of gender discrimination. *See Vuona v. Merrill Lynch & Co.*, 919 F. Supp. 2d 359, 372 (S.D.N.Y. 2013) (finding evidence that where women and men were "included on the presumptive layoff list for strictly objective reasons" later "supplemented by subjective, discretionary decision-making" leading to the removal of three men originally included on the presumptive layoff list, while plaintiffs (women) remained on the list and were terminated, was sufficient to permit inference of discrimination).

Defendants argue that "any claim that Plaintiff was denied promotion due to her gender is undercut by the fact that one of the lower-scoring candidates who was selected for promotion was a female." (Dkt. No. 93, at 18). During the third promotional cycle, Defendants again skipped Plaintiff, but hired C.L. (female), as well as K.A. (male). (Dkt. No. 77-13, ¶ 47). There is case law in this Circuit supporting the proposition that "it is 'extremely difficult, if not

practically impossible' to establish discrimination where . . . [the] plaintiff was passed over so an employer can hire another member of plaintiff's same protected class." *Rodriguez v. N.Y.C. Health & Hosps. Corp.*, No. 14-cv-4960, 2015 WL 5229850, at *5, 2015 U.S. Dist. LEXIS 119040, at *14 (E.D.N.Y. Sept. 8, 2015) (quoting *Fleming v. MaxMara USA, Inc.*, 644 F. Supp. 2d 247, 261 (E.D.N.Y. 2009)). While Defendants' promotion of C.L. (female) during the third promotional cycle may weaken any inference of discrimination, this is not a case where there is no other evidence of discrimination. *See Johnson v. N.Y.C. Dep't of Educ.*, 39 F. Supp. 3d 314, 323 (E.D.N.Y. 2014) ("Where no other evidence giving rise to an inference of discrimination has been presented, the fact that a plaintiff is replaced with an individual within his protected class undermines his attempt to establish a prima facie case of discrimination." (internal quotation marks and alterations omitted)). Here, Plaintiff has adduced evidence that during the three other promotional cycles, Plaintiff was passed over and male police officers were promoted instead. Accordingly, as Plaintiff has established a prima facie case of gender discrimination, the Court proceeds to the next step.

## 2.      Legitimate Nondiscriminatory Reasons

Once Plaintiff has shown a prima facie case of discrimination, the burden falls on Defendants to show a "legitimate, nondiscriminatory reason" for not promoting Plaintiff. *McDonnell Douglas Corp.*, 411 U.S. at 802. Defendant's burden "is not a particularly steep hurdle." *Hyeck v. Field Support Servs., Inc.*, 702 F. Supp. 2d 84, 93 (E.D.N.Y. 2010). It "is one of production, not persuasion; it 'can involve no credibility assessment.'" *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 142 (2000) (quoting *Hicks*, 509 U.S. at 509). Defendants have satisfied their burden here with evidence that the decision not to promote Plaintiff was because Plaintiff did not have recent Patrol experience. *See, e.g., Kellman v. Metro. Transp. Auth.*, 8 F. Supp. 3d 351, 376 (S.D.N.Y. 2014) ("Defendants have stated a legitimate, nondiscriminatory

reason for the denial: [the plaintiff] did not have sufficient investigatory and supervisory experience."). Accordingly, the burden returns to Plaintiff.

### 3.    Pretext for Gender Discrimination

Since Defendants have offered a legitimate, nondiscriminatory reason for terminating Plaintiff, the "presumption of discrimination drops from the picture" and the burden shifts back to Plaintiff, who must "come forward with evidence that the defendant's proffered, non-discriminatory reason is a mere pretext for actual discrimination." *Weinstock v. Columbia Univ.*, 224 F.3d 33, 42 (2d Cir. 2000). At the third stage of the *McDonnell Douglas* burden-shifting analysis in a § 1983 case, a plaintiff "must establish that the defendant's discriminatory intent was a 'but-for' cause of the adverse employment action." *Naumovski*, 934 F.3d at 214. "It is insufficient to establish simply that invidious discrimination was 'a motivating factor' of the offending conduct." *Id.* When considering whether discriminatory intent was a "but-for" cause of the adverse action at the summary judgment stage, courts "must determine whether, construing the evidence in a light most favorable to the plaintiff, a reasonable jury could find that the adverse employment action would not have occurred 'but-for' sex discrimination." *Id.* This "higher burden" in a § 1983 action means that in order to "establish 'pretext' . . . a plaintiff must establish that the employer's stated reason would not, alone, constitute a sufficient basis for pursuing an adverse action." *Id.* at 215. "In other words, a § 1983 plaintiff must establish that the employer's stated non-discriminatory reason is either false or inadequate to support the adverse employment action." *Id.* This means that "a § 1983 plaintiff's burden at the third stage of the *McDonnell Douglas* analysis is not simply to establish that discrimination played *some* role in her termination, but that it played a *decisive* role." *Id.* at 217.

Here, Plaintiff presents evidence that C.R. and K.A., both of whom were lower on the list than Plaintiff, with scores of 81.5 and 79, respectively, (Dkt. No. 84-14, at 5), lacked recent

Patrol experience, but were nonetheless promoted to sergeant, (Dkt. No. 87, at 27 (arguing that male officers "were promoted and not required to 'prove' themselves" through recent Patrol duty). Plaintiff also asserts that Mark Rusin and Mark Werbeck were not "required to transfer to patrol or the road before or after their promotion" under Chief Buckner from police officer to sergeant. (Dkt. No. 85, ¶ 21). Deputy Chief Cecile explains that Rusin and Werbeck were "promoted in November 2019—before Plaintiff was reachable" for promotion—and worked in non-Patrol divisions (Compliance Unit and Information Technology and Records) "where there was a need for Sergeants to serve in a supervisor role." (Dkt. No. 93-1, ¶ 9). Deputy Chief Cecile further states that during the relevant promotional cycles, there was "a significant need for supervisors on Patrol" and "all newly promoted Sergeants in late 2020 and 2021 were assigned to Patrol regardless of their previous assignment." (*Id.* ¶ 11). It is undisputed that K.A. was not in Patrol prior to promotion. (*See* Dkt. No. 84-42, at 2 (memo dated December 20, 2016, regarding K.A.'s permanent transfer from Patrol to the Administration Bureau, Technology & Program Management Division)). However, Deputy Chief Shoff states that Defendants "did not have the same concerns about [K.A.'s] ability to work patrol because he did not have the same history of difficulties on patrol as we understood Plaintiff did" and because he worked eleven "summer deployment shifts in 2019 . . . as opposed to Plaintiff's three shifts." (Dkt. No. 77-35, ¶ 33). But Defendants do not address the evidence that when Plaintiff returned from maternity leave in July 2017, after having obtained treatment for PTSD and having been medically cleared to return, she was again assigned to work Patrol, where she worked without incident until April 2, 2018, when she transferred to Records. (Dkt. No. 84-2, at 133; Dkt. No. 77-5, at 34). Chief Buckner testified that his concerns about Plaintiff's ability to supervise on Patrol stemmed from their December 2018 conversation during which she recounted her history of PTSD and expressed her concerns

"about going back to the streets," (Dkt. No. 77-8, at 2), but Plaintiff testified that she "never once said to [Chief Buckner] that [she] was scared [or did not want] to go back to the road." Thus, there is a factual question as to whether Plaintiff's lack of recent Patrol experience and PTSD were legitimate reasons for failing to promote Plaintiff or a pretext for unlawful gender discrimination. The Court therefore concludes that as Plaintiff has presented evidence from which a factfinder could conclude that Defendants' stated reason for denying promotion, lack of recent, i.e., post-PTSD diagnosis, Patrol experience, was false or inadequate and that, given that eight male officers with lower civil scores were promoted over her, *see Goonewardena v. New York Workers Comp. Bd.*, 258 F. Supp. 3d 326, 341 (S.D.N.Y. 2017) ("Evidence that an employee was replaced by an individual outside his protected group—particularly if that individual is less qualified—may be probative of pretext." (citing *Ash v. Tyson Foods, Inc.*, 546 U.S. 454, 457 (2006), *aff'd*, 788 F. App'x 779 (2d Cir. 2019), gender-related discrimination was the true reason. Although there is no direct evidence of gender-related animus and Plaintiff's evidence of gender-related discrimination is relatively weak when viewed in light of the evidence that there were only two females in the field of eligible candidates and that Defendants in fact promoted the other female officer, who also had a lower civil service score than Plaintiff, given the material issues of fact, and drawing all inferences in Plaintiff's favor, Defendants' motion for summary judgment is denied.

### 4.     Personal Involvement - Chief Buckner & Deputy Chiefs

A § 1983 claim requires the plaintiff to show an individual defendant's "personal involvement" in the alleged violation. *Naumovski*, 934 F.3d at 212. In other words, "[i]f a defendant has not personally violated a plaintiff's constitutional rights, the plaintiff cannot succeed on a § 1983 action against the defendant." *Raspardo v. Carlone*, 770 F.3d 97, 115 (2d Cir. 2014) (emphasis in original). Thus, "a plaintiff must plead and prove that each Government-

official defendant, through the official's own individual actions, has violated the Constitution."

*Tangreti v. Bachmann*, 983 F.3d 609, 614 (2d Cir. 2020) (internal quotation marks and citation

omitted). Here, Defendants do not dispute that Chief Buckner was personally involved in

denying Plaintiff's promotion to sergeant for purposes of liability under § 1983 as well as

NYHRL. He testified to his role in denying Plaintiff a promotion during each promotional cycle,

and there is sufficient evidence from which a factfinder could find he was motivated by

discriminatory intent based on gender. However, Defendants move for summary judgment

dismissing Deputy Chiefs McGork, Trudell, Cecile and Shoff for lack of personal involvement.

(Dkt. No. 77-1, at 49–52). Plaintiff has presented evidence that each of the Deputy Chiefs

participated in her promotion interview and that the voting to deny her promotion was

"unanimous." (Dkt. No. 84-3, at 130). Further, there is evidence that each Deputy Chief was

involved in the consideration and selection of each of the male candidates selected for promotion

and thus shared in Chief Buckner's discriminatory intent. (Dkt. No. 84-48, at 11–12 (McGork

stating that "he was involved in the consideration and selection of these candidates for

promotion"); Dkt. No. 84-49 (Trudell same); Dkt. No. 77-24, ¶¶ 34–50 (Cecile discussion

decision-making process and consideration of Plaintiff for sergeant as well as selection for

promotion of male officers); Dkt. No. 77-35, ¶¶ 7–9 (Shoff stating that he "participated in the all

the interviews for the position of Sergeant in 2020 and 2021, and participated in meetings with

Chief Buckner and the other Deputy Chiefs . . . to debrief on the interviews," and "offered input

on the [promotional] decisions")).[25]

---

[25] Although Deputy Chief Shoff maintains that he advocated for Plaintiff's promotion, and that "it was clear to [him] that Chief Buckner was the decisionmaker," in light of Chief Buckner's testimony that the promotion decisions regarding Plaintiff were "unanimous," the Court concludes there are factual questions regarding the extent of Deputy Chief Shoff's involvement.

Given this evidence of the Deputy Chiefs' actual participation in the interview and discussion leading to the promotion denial(s), a reasonable fact finder could conclude that they were personally involved in and aided and abetted the City and Chief Buckner's gender-based discrimination toward Plaintiff. *Dodd v. City Univ. of N.Y.*, 489 F. Supp. 3d 219, 269 (S.D.N.Y. 2020) ("Dodd has adduced evidence that could be found to constitute actual participation in the process leading to the tenure denial. In particular, there is evidence that Cronin denied her request to teach at the Graduate Center, a credential and experience which Dodd has credibly asserted stood to bolster her coming bid for tenure."). Accordingly, Defendants' motion for summary judgment as to Plaintiff's NYSHRL gender discrimination claim is denied.

### D. Race Discrimination – Title VII, Fourteenth Amendment, & § 1981 – City, Buckner

Defendants seek summary judgment dismissing Plaintiff's claim that the City and Chief Buckner denied her promotion to sergeant due to her race, in violation of Title VII (City only), the Fourteenth Amendment, and § 1981. (Dkt. No. 77-1, at 21–23). Plaintiff opposes summary judgment. (Dkt. No. 87, at 12–13). The familiar burden-shifting framework outlined above applies to Plaintiff's race discrimination claim. *See*, *e.g.*, *Kirkland v. Cablevision Sys.*, 760 F.3d 223, 225 (2d Cir. 2014) (citing *McDonnell Douglas*, 411 U.S. at 802) (Title VII race discrimination and retaliation); *Garcia v. Hartford Police Dep't*, 706 F.3d 120, 127–31 (2d Cir. 2013) (§ 1981 and § 1983 race discrimination).

#### 1. Prima Facie Case

Plaintiff has satisfied the first and second factors because it is undisputed that being white is a member of a protected class and that she was qualified to be a sergeant. In addition, Defendants do not dispute the failure to promote to sergeant is an adverse action. Accordingly,

the Court need only consider whether Plaintiff has presented evidence that would permit an inference that the failure to promote was attributable to race discrimination.

Plaintiff relies on evidence that during the first promotional round, Defendants skipped Plaintiff (score 83) and promoted C.R. (score 81.5), a Black officer with a lower civil service score, and that in the third promotional round, Defendants skipped Plaintiff and promoted C.L. (score 76), a Black officer with a lower civil service score. (Dkt. No. 77-13, ¶ 53). Evidence that Defendants promoted similarly situated Black officers with lower civil service scores than Plaintiff is sufficient to establish an inference of racial discrimination at the prima facie stage. *See*, *e.g.*, *Littlejohn v. City of New York*, 795 F.3d 297, 313 (2d Cir. 2015) ("The fact that a plaintiff was replaced by someone outside the protected class will ordinarily suffice for the required inference of discrimination at the initial prima facie stage").

### 2.      Legitimate Nondiscriminatory Reasons

As discussed, Defendants have adduced evidence of a legitimate nondiscriminatory reason for not promoting Plaintiff to sergeant. *See supra* Section IV.C.2.

### 3.      Pretext for Race Discrimination

Again, Plaintiff has raised a material issue of fact as to the whether lack of recent patrol experience was pretextual. Here, Plaintiff relies on evidence that Deputy Chief Cecile was aware that Chief Buckner wanted to promote the hiring, promotion, and retention of black officers, (Dkt. No. 84-14, at 65), and Deputy Chief Shoff testified that Chief Buckner had "expressed that he would like to see more diversity." (Dkt. No. 84-6, at 134). The Second Circuit has explained that "an employer's stated desire for diversity in the workplace does not, without more, establish discriminatory intent with respect to any particular employment decision." *Vill. of Freeport v. Barrella*, 814 F.3d 594, 614 (2d Cir. 2015). The Circuit has also recognized that "the urge of politicians to take credit for hiring or promoting members of hitherto underrepresented

communities has often 'been a powerful means of achieving the social and political integration of excluded groups.'" *Vill. of Freeport*, 814 F.3d at 614–15. However, because "[t]he line between legitimate politics and illegitimate racial discrimination can be difficult to draw in practice" and can "present[] inherently thorny questions of motivation," *id.* at 615, the Court concludes that material issues of fact preclude summary judgment. Accordingly, Defendants' motion for summary judgment as to Plaintiffs' race discrimination claim is denied.

### 4.     Personal Involvement – Chief Buckner

To establish a section 1981 claim against an individual defendant, a plaintiff must show the defendant's personal involvement with the alleged discrimination or retaliation. *See Littlejohn*, 795 F.3d at 314. Defendants do not dispute Chief Buckner's personal involvement in connection with Plaintiff's race discrimination claim.

### E.     Retaliation – ADA, RHA, Fourteenth Amendment, & NYSHRL – City and Buckner

Defendants move for summary judgment dismissing Plaintiff's claim that they failed to promote her during the third and fourth promotional cycles in retaliation for her complaints about disability discrimination in her October 15, 2020, and December 9, 2020, emails. (Dkt. No. 77-1, at 41–48). Plaintiff opposes Defendants' motion. (Dkt. No. 87, at 31–34).

ADA, RHA, § 1983, and NYSHRL retaliation claims are also analyzed under the *McDonnell Douglas* burden-shifting framework. *See Greenway v. Buffalo Hilton Hotel*, 143 F.3d 47, 52 (2d Cir. 1998) (ADA); *Gentile v. Potter*, 509 F. Supp. 2d 221, 232 (E.D.N.Y. 2007) (citing *Reg'l Econ. Cmty. Action Program, Inc. v. City of Middletown*, 294 F.3d 35, 48–49 (2d Cir. 2002)) (RHA); *Vega*, 801 F.3d at 91 (§ 1983); *Mittl v. N. Y. State Div. of Human Rts.*, 100 N.Y.2d 326, 330 (2003) (NYSHRL). If Plaintiff establishes a prima facie case, the burden shifts to the employer to demonstrate that a legitimate, nonretaliatory reason existed for its action.

*Summa v. Hofstra Univ.*, 708 F.3d 115, 129 (2d Cir. 2013). If the employer demonstrates a legitimate, nonretaliatory reason for the adverse employment action, the burden shifts back to the employee to establish that the employer's action was caused by a retaliatory motive. *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 362 (2013).

### 1.    Prima Facie Case

To establish a prima facie case of retaliation, a plaintiff must show that she (1) engaged in protected activity, (2) that the defendant was aware of the activity and (3) took an adverse employment action against the plaintiff, and (4) that there is a causal connection between the protected activity and the adverse employment action. *Summa*, 708 F.3d at 125.

Here, Defendants do not dispute that they were aware of Plaintiff's October 15, 2020 and December 8, 2020 emails or that denial of promotions to sergeant during the third and fourth promotional cycles in February and June 2021 constitute adverse actions.[26] (Dkt. No. 77-1, at 41–45). However, Defendants argue that Plaintiff's "disruptive and confrontational emails cannot constitute protected activity" and that Plaintiff has failed to show a causal connection. (*Id.* at 42–45).

### a.    Protected Activity

"The term 'protected activity' refers to action taken to protest or oppose statutorily prohibited discrimination." *Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 566 (2d Cir. 2000). Further, "opposition . . . need not rise to the level of a formal complaint in order to receive statutory protection." *Id.* Instead, "'opposition' includes activities such as 'making complaints to management, writing critical letters to customers, protesting against discrimination by industry

---

[26] The parties agree that the adverse employment actions at issue are limited to the third and fourth promotional cycles as the first and second promotional cycles pre-date Plaintiff's alleged protected activity. (Dkt. No. 77-1, at 41; Dkt. No. 87, at 31).

or by society in general, and expressing support of co-workers who have filed formal charges.'" *Id.* (quoting *Sumner v. U.S. Postal Serv.*, 899 F.2d 203, 209 (2d Cir. 1990)). "'[I]mplicit in the requirement that the employer [was] aware of the protected activity is the requirement that the [employer] understood, or could have reasonably understood,' that the plaintiff's complaints, constituting the protected activity, were based on conduct prohibited by [statute]." *Rosioreanu v. City of New York*, 526 F. App'x 118, 120 (2d Cir. 2013) (summary order) (quoting *Galdieri– Ambrosini v. National Realty & Dev. Corp.*, 136 F.3d 276, 292 (2d Cir. 1998)).

Plaintiff argues that whether her October 15, 2020, and December 9, 2020 emails are so disruptive as to strip them of their status of protected conduct is a factual question. (Dkt. No. 87, at 32). The Court agrees. While there is support for the proposition that a statutory anti-retaliation provision "is not a license for offensive, disruptive, rude, or demeaning behavior," *Finn v. N.Y. State Off. of Mental Health-Rockland Psychiatric Ctr.*, No. 08-cv-5142, 2011 WL 4639827, at *18, 2011 U.S. Dist. LEXIS 115950, at *50 (S.D.N.Y. Oct. 6, 2011 (Title VII), *aff'd.*, 489 F. App'x 513 (2d Cir. 2012) (summary order), here Plaintiff's emails expressly reference her belief that she was being denied promotion because of her PTSD diagnosis, (Dkt. No. 84-24, at 4), and that she was being treated differently because of the nature of her disability, (Dkt. No. 77-21, at 2). This is sufficient, at the prima facie stage, to show protected activity. *See*, *e.g.*, *Matima v. Celli*, 228 F.3d 68, 80 (2d Cir. 2000) (concluding that "we need not decide whether such disruptive, unreasonable conduct raises an issue that bears on the prima facie case" because, inter alia, the issue of whether disruptive conduct had "obvious bearing on the second step of the *McDonnell Douglas* burden shifting analysis").

### b.   Causal Connection

Given the evidence of close temporal proximity—approximately two months—between the December 8, 2020 complaint of disability discrimination and the denial of promotion in

February 2021 during the third promotional cycle, Plaintiff has established a causal connection. The fourth promotional cycle occurred in June 2021 and thus does not share the same temporal proximity. However, in view of the evidence that during their December 8, 2020 meeting Plaintiff raised the issue of retaliation with Chief Buckner and he responded: "call it what you will" and told Plaintiff to "knock it off," the Court concludes that Plaintiff has adduced evidence from which an inference of retaliatory animus can be drawn and has thus established a causal connection with respect to the denial of promotion during the fourth promotional cycle as well.

### 2.    Legitimate Nondiscriminatory Reasons

Here, as discussed previously, Defendants have adduced evidence of a legitimate, nondiscriminatory reason for denying Plaintiff promotion to sergeant. And to the extent Chief Buckner considered Plaintiff's October 15, 2020 and December 8, 2020 emails in denying promotion, Defendants have presented evidence that such consideration was based on Plaintiff's allegedly disrespectful and insubordinate conduct.

### 3.    Pretext for Retaliation

Here, Plaintiff relies on her prior arguments of pretext and disparate treatment and asserts that the SPD "has a custom or policy of retaliating against employees who complain of discrimination." (Dkt. No. 87, at 32–33 (citing Dkt. No. 84-44, at 7 (verdict sheet entered on March 23, 2010, in *Lee v. City of Syracuse*, No. 06-cv-949 reflecting a jury finding that the City of Syracuse had a custom or policy of retaliating against employees who complain of discrimination))).[27] Defendants object to Plaintiff's reliance on a "fourteen-year-old verdict . . . from a totally unrelated case without any apparent connection to the promotion decisions at issue" and assert, relying on their prior arguments, that Plaintiff's "position is not supported by

---

[27] Plaintiff refers to a "custom or policy" of retaliation not for the purpose of *Monell* liability but in an attempt to establish an inference of retaliation. (*See* Dkt. No. 87, at 32–33).

facts, nor is it sufficient to demonstrate that retaliation was the 'but-for' cause of Plaintiff's non-promotion during the February and June 2021 promotion cycles." (Dkt. No. 93, at 26–27). As the Court has previously found that questions of fact preclude summary judgment at this step with respect to Plaintiff's discrimination claims and Defendants have not otherwise meaningfully briefed this last step in the context of retaliation, the Court denies summary judgment as to the City and Chief Buckner.[28]

### F.     Tortious Interference – Buckner, Shoff, McGork, Cecile, Trudell

Defendants argue that they are entitled to summary judgment dismissing Plaintiff's tortious interference claim against the Deputy Chiefs on the ground that the collective bargaining agreement with which Plaintiff claims Defendants interfered is not a contract between Plaintiff and a third party but a contract between the PBA and the SPD and that her claim is therefore legally insufficient. (Dkt. No. 77-1, at 48–49). Plaintiff opposes summary judgment, arguing that her tortious interference claim is premised on Defendants' alleged tortious interference with her employment, not the CBA. (Dkt. No. 87, at 33–34). Specifically, Plaintiff asserts that she "has shown Defendants acted maliciously in that their conduct was designed to discriminate on the basis of disability, gender, race, and protected activity." (*Id.* at 34). Plaintiff cites no evidence in support of this assertion. Further, "[e]ven if the Court inferred 'malice' from the discriminatory and retaliatory acts that [P]laintiff alleges [Defendants] committed during [Plaintiff's] tenure, such conduct is insufficient to establish 'independent tortious act[s]' under New York law to sustain a tortious interference claim brought by an employee against her superior." *Emmons v. City Univ. of N.Y.*, 715 F. Supp. 2d 394, 425 (E.D.N.Y. 2010) (citing *Baguer v. Spanish Broad. Sys., Inc.*, No. 04-cv-8393, 2007 WL 2780390, at *4, 2007 U.S. Dist. LEXIS 70793 *9

---

[28] Defendants do not dispute Chief Buckner's personal involvement.

(S.D.N.Y. Sept. 20, 2007)). Accordingly, Defendants' motion for summary judgment with respect to Plaintiff's tortious interference claim is granted.

## V.       CONCLUSION

For these reasons, it is

**ORDERED** that Defendants' motion for summary judgment (Dkt. No. 77) is **GRANTED** in part and **DENIED** in part; and it is further

**ORDERED** that Defendants' motion for summary judgment with respect to Plaintiff's tortious interference claim is **GRANTED** and Plaintiff's tortious interference claim is **DISMISSED**; and it is further

**ORDERED** that Defendants' motion for summary judgment is otherwise **DENIED**.

**IT IS SO ORDERED.**

Dated: <u>May 24, 2024</u>
       Syracuse, New York

Brenda K. Sannes
Chief U.S. District Judge